**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| TIM-MINN, INC., a Minnesota Corporation, <br><br>             Plaintiff, <br><br>    v. <br><br> TIM HORTONS USA, INC. <br><br>           Defendant. | Civil No.:0:19-cv-00409-JNE-ECW |

## SECOND AMENDED COMPLAINT

Plaintiff, Tim-Minn, Inc., (hereinafter "Tim-Minn" or "Plaintiff") and by and through its attorneys, brings this action against Defendant Tim Hortons, Inc. ("THUSA" or "Defendant"). Plaintiff states and alleges the following based upon information and belief after due investigation by the undersigned counsel and the personal knowledge of the Plaintiff.

## NATURE OF THE ACTION

1.      Plaintiff brings this action to address and find relief from the false and misleading practices and omissions used by Defendants in connection with the sale of the Area Representative and Development Agreement ("ARDA") and Franchise Agreement(s), which it entered into with Defendant THUSA. In addition, Plaintiff brings this action to address serious, material breaches of its agreements with THUSA, which have caused, and continue to cause, Plaintiff significant financial and other losses, which imperil its ability to operate its businesses on an ongoing basis.

2.      In particular, Plaintiff alleges THUSA provided false and/or misleading financial representations to Tim-Minn outside of the confines of their Franchise Disclosure Document ("FDD"), which were materially different from the financials provided to the State of Minnesota

Commerce Department in connection with the registration of that FDD under the Minnesota Franchise Act ("MFA"), Minn. Stat. § 80C.01 *et seq.*  Plaintiff further alleges the FDD Tim Hortons provided to Tim-Minn was missing the complete Item 19 disclosures that were registered with the Commerce Department.  Critically, THUSA never obtained an executed Item 23 receipt from Plaintiff at the time of disclosure, and did not request an executed Item 23 receipt until early September 2015, weeks after THUSA's agent originally disclosed to Plaintiff the adulterated FDD and, importantly, weeks after Plaintiff's agent had executed an NDA in THUSA's favor and the parties were actively working together on their business relationship in violation of Minnesota and Federal law.

3.       These false and/or misleading financial representations were used to induce Plaintiff into agreeing to develop THUSA's business in the State of Minnesota, a wholly new market for the Tim Hortons franchise system and under which Plaintiff would serve as an area developer and franchisee with responsibility for building out the territory from zero to more than 280 stores.

4.       However, and as will be pled in detail elsewhere herein, THUSA's financial representations were not only violative of the MFA, but also had little to no bearing on the actual Minnesota market, such that Plaintiff's due diligence, which almost totally relied upon the data provided by THUSA, was fundamentally undermined.

5.       Losing money and working to maintain a crushing development schedule, Plaintiff and THUSA, along with its corporate parent, Restaurant Brands International, LP ("RBI"), entered negotiations to amend their master agreement.  In so doing, THUSA again violated the MFA by including a "General Release" in the amended contract, which purported to waive numerous rights and claims Plaintiff was entitled to under the MFA.  This release was little more than an attempt

to inoculate THUSA from any claims Plaintiff might have under the original agreement and therefore is **void and unenforceable**.

6.      The false and/or misleading financial representations provided to Plaintiff by Defendants caused Plaintiff to invest a substantial amount of money, time, and effort into building out the Tim Hortons[1] Restaurants brand in Minnesota, but the anticipated income from the venture – as represented by THUSA's financial disclosures, never materialized because those numbers were flawed, incomplete, and lacked crucial variables.

7.      In addition to the foregoing, Plaintiff alleges that THUSA misrepresented material facts about its system in its FDD in furtherance of a scheme to purchase and operate franchises, and pay franchise-related fees.  THUSA exploited its control and overweening economic power in order to extract exorbitant and unjustifiable payments from Tim-Minn.  As a result, THUSA has reaped (and continues to reap) inflated sales and profits while causing substantial, financial harm to Plaintiff.

8.      To execute this scheme, THUSA preyed upon an inexperienced franchisee interested in partnering with Tim Hortons to bring quality coffee and baked goods products to an as-yet-untapped market.   Tim-Minn has no prior experience in franchising or restaurant management whatsoever.  THUSA used knowingly deceptive statements in its FDD in order to obtain Plaintiff's trust and confidence in a fraudulent effort to build its brand in the United States and implement its scheme.

9.      This matter is about broken promises, unfulfilled contractual expectations and false and misleading statements and omissions.  Tim-Minn invested millions of dollars in bringing the Tim Hortons brand to Minnesota, only to learn too late that THUSA had employed misleading,

---

[1] For the Court's convenience, the term "Tim Hortons" shall refer to the franchise system owned by Defendants, and not Defendant THUSA.

21314715v1

unlawful financial representations to induce its efforts in this State.  This lawsuit addresses a flawed and deceptive economic model manipulated by those in control of the franchise system for their own self-serving gain.

10.     The Core of this problem is the FDD provided to Plaintiff in 2015: in its Item 8 disclosures, THUSA advised:

> …you must purchase or lease all products, fixtures, furnishings, building components, equipment, décor, signs, Paper goods, containers, cartons, packaging, supplies, and smallwares and other utensils, services, including project management services, product ingredients, insurance and other items installed in used, or sold by the Shop ("**Items**") solely from suppliers who have been approved by us and all these Items must meet our specifications.  We can designate ourselves, our affiliates, or a third party as the sole supplier for any Item. … We and our affiliates may charge what we consider to be a ***reasonable mark-up*** (*emphasis added*) on items sold to you.

11.     What THUSA did not disclose, and what Plaintiff could not have known at that time, was that THUSA was engaged in a predatory practice whereby it charged objectively **unreasonable** markups on dozens – if not hundreds – of necessary items.

12.     THUSA uses mandatory supply relationships it imposed upon Plaintiff (and all its franchisees, for that matter) to extract supra-competitive profits from Plaintiff, altogether ignoring its legal obligation to limit those markups to a "reasonable" amount.  This lie, along with other false financial representations detailed elsewhere herein, has damaged Plaintiff and undermined its ability to operate its restaurants and territory profitably while simultaneously lining THUSA's pockets.

13.     In their effort to bilk Plaintiff, THUSA exploits its information advantage in the market for the "Items" covered in the disclosure above, and as set forth in the Franchise Agreement(s).  Through this overwhelming power and control, THUSA has exclusive control over

not just *what* Tim-Minn purchase, but also *how much it costs* Tim-Minn.  THUSA has exclusive right to compel Plaintiff's purchase of an estimated **100% of its purchases** in order to:

    a.  Purchase needed goods and services in quantities far greater than those necessary to meet its operational need;

    b.  Force franchisees and developers like Tim-Minn and its subsidiary entities to accept so-called "Drop Shipments" which are unasked for products ordered by THUSA and dropped off for new product launches and limited time offers ("LTOs") and franchisees/developers are given no choice but to pay for these products; and

    c.  Work with THUSA-mandated distributors and pay those distributors excessive prices for goods and services substantially exceeding what Plaintiff would pay in arm's length transactions due to the altogether unnecessary and entirely unreasonable markups and fees for the alleged "wholesaling" done by the THUSA-controlled providers.

    14.    THUSA makes money in two ways: by selling franchises and collecting recurring fees from those franchisees in the form of royalties and other fees, and by selling required Items to franchisees at a markup.  It is this second manner of producing income which is so egregious, because by any objective metric, THUSA's markups are unreasonable and predatory.  More, the predatory and unreasonable markups on these Items were not only not disclosed by THUSA prior to Tim-Minn's entry into the system, they establish that THUSA's statements were false and misleading as contained in the FDD.  Moreover, it is entirely inconsistent with THUSA's promise to keep these markups "reasonable."

    15.    Finally, Plaintiff alleges THUSA failed to perform its obligations under the parties' contracts, hampered Plaintiff's ability to locate and secure additional restaurant sites, and has forced Plaintiff into a position wherein it is in danger of breaching its area development responsibilities to THUSA through no fault of its own.

16.     To redress these issues, Plaintiff alleges, therefore, that Defendant violated the FTC's Franchise Rule (16 CFR § 436), the Minnesota Franchise Act, and the common law of the State of Minnesota.  Plaintiff seeks monetary damages, attorney's fees and costs, and all other such relief as the Court may deem equitable and just under the circumstances.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the parties and subject matter in this civil action pursuant to 28 U.S.C. § 1332(a) in that the parties are citizens of different states and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.  The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

18.     Further, Defendant is subject to the long arm jurisdiction of this Court pursuant to *inter alia*, Minn. Stat. § 80C.21 and Minn. Stat. § 543.19 because Defendant operated, conducted, engaged in, and/or carried on a business or business venture within the State of Minnesota; committed an act within the State of Minnesota which caused injury to Plaintiff; and/or committed an act outside the State of Minnesota which caused injury to Plaintiff within the State of Minnesota, the nature of which Minnesota has an interest in.  Namely, the Defendant operates and operated the Tim Hortons franchise system and made the complained-of false and misleading financial representations to Plaintiff concerning a franchise to be operated in Minnesota.

19.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) and Minn. Stat. § 542.01 and 542.09 because Defendant is a foreign entity who conducts business in Minnesota and Plaintiff's principal place of business is in Minnesota, it conducts business almost totally within the jurisdiction this Court, and the events which give rise to this action are focused upon the State of Minnesota.  Defendant maintains continuous and systematic contacts with the forum State, including but not limited to the efforts of Stephen Goldstein, who at all times relevant

hereto acted as THUSA's agent and representative in Minnesota, such that his conduct is attributable to Defendant. Additionally, Plaintiff reasonably believes the choice of venue is not a substantial prejudice upon the Defendant.

20.     For the sake of transparency, the ARDA contains a forum selection and choice of law provision favoring the state and federal district courts of the State of Florida and Florida law. Plaintiff reasonably believes that, pursuant to Minn. Stat. §80C.21, such provisions are void and unenforceable under the stated public policy and laws of the State of Minnesota.

## PARTIES

21.     Plaintiff, Tim-Minn, is an incorporated entity organized under the laws of the State of Minnesota with a principal place of business at with a principal place of 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota. Tim-Minn is wholly owned by Restaurant Development Partners, Corp. ("RDP"), an Ontario, Canada based entity.

22.     Before entering into a business relationship with THUSA to build out and create a market for Tim Hortons in Minnesota, RDP has no prior experience whatsoever in franchising or the restaurant industry on a retail level; it is a property developer and builder in Canada.

23.     Defendant, THUSA, is a Delaware incorporated entity with a principal place of business located at 5505 Blue Lagoon Drive, Miami, Florida 33126. THUSA is the franchisor of the Tim Hortons quick-service franchise restaurant system.

## BACKGROUND FACTS

**A.     Tim Hortons' Franchise Disclosure Document is Governed by the FTC Franchise Rule**

24.     The Federal Trade Commission has promulgated certain laws requiring the delivery to prospective franchisees of a prescribed disclosure document, previously called a UFOC and now a FDD, concerning the franchisor, its management, and the material terms and conditions of

7

the franchise agreement, among other things, prior to the execution of any agreement by a prospective franchisee.  This was known as the Franchise Rule, and the Amended Franchise Rule became effective as of July 1, 2007. The UFOC was, and the FDD is now, a disclosure format accepted by the FTC for conveying such information to prospective franchisees.

25.     The Franchise Rule requires a franchisor to provide prospective franchisees with certain disclosures.  16 C.F.R. 436.2(a).  These representations must be accurate to the best of the franchisor's knowledge and clearly and concisely stated.  Moreover, "it is an unfair and deceptive act" for any franchisor to violate a provision of the Franchise Rule.  *Id.*

26.     The Franchise Rule holds that "it is an unfair and deceptive act or practice...for any franchisor" to "make any claim or representation…that contradicts the information required to be disclosed by [16 C.F.R. 436]." 16 C.F.R. § 436.9; 15 U.S.C. § 57a (d) (3).  Furthermore, the MFA, and the rules promulgated thereunder, provide that violations of the rules promulgated under the Federal Trade Commission Act are violations of Minnesota law.

27.     Moreover, under the MFA, unfair and deceptive practices by franchisors with respect to the sale of franchises covered by the Act are prohibited.  *See e.g.,* Minn. Admin. Rules 2860.3500, 2860.4400, 2860.4500.

28.      THUSA has violated federal regulations and Minnesota law insofar as it has engaged in deceptive and unfair practices with respect to the disclosures made in its FDD to Plaintiff, as well as other conduct to be detailed below.

**B.     The Tim Hortons Story**

29.     Tim Hortons is a well-known quick service coffee shop and bakery in Canada and has, over the past several years, made significant inroads into various northern-US markets.

30.     The Tim Hortons brand was developed in the 1960s by former NHL player Miles G. "Tim" Horton with the assistance of his partner, Ron Joyce.

31.     By 2000, there were two thousand (2,000) "Tim Hortons" cafes in the United States and Canada.

32.     In 2014, Tim Hortons merged with Burger King and formed RBI, with both franchisors operating under RBI's umbrella.  As part of the impetus for the merger, Tim Hortons desired to leverage Burger King's resources for further, international expansion among other needs.

33.     THUSA is responsible for managing and conducting Tim Hortons' United States-based franchising.

### FACTS GENERALLY APPLICABLE TO ALL COUNTS

**A.      The Initiation of the Business Relationship Between Tim-Minn and THUSA**

34.     On July 23, 2015, Mark Holly (a former employee of Tim Hortons) connected Paul Durigon ("Durigon"), Tim-Minn's principal, with Stephen J. Goldstein ("Goldstein"), former Vice President of U.S. Development for THUSA via email.  A true and correct copy of this email chain is annexed hereto as Exhibit A.

35.     At the time Goldstein and Durigon were introduced, Tim-Minn did not yet exist, and was merely a contemplated entity should talks progress further.

36.     Goldstein and Durigon mutually expressed interest in working together on expanding Tim Hortons in the United States.  *See,* Exhibit A.

37.     Durigon is also part of the ownership of a Canadian construction company which participated in the construction of several Tim Hortons restaurants across Canada and serves as a landlord for a few Canadian Tim Hortons franchisees and was familiar with the brand.

38.     Durigon was not a sophisticated purchaser of either franchises or area development agreements and originally sought a "partnership" with THUSA, as evidenced throughout several of the parties' emails.  (as attached hereto)

39.     On July 27, 2015, Durigon executed a non-disclosure agreement ("NDA") drafted by THUSA.  A true and correct copy of this NDA is annexed hereto as Exhibit B.

40.     The following day, Durigon traveled to Tim Horton's corporate headquarters in Oakville, Ontario to meet with Goldstein regarding opportunities in the United States.

**B.     Goldstein and Durigon Begin Negotiating Terms for The First ARDA**

41.     On August 3, 2015, and subject to the NDA, Goldstein sent five, identical emails to Durigon, attaching what was represented to be THUSA's then-current FDD (dated May 2015), as well as several, additional documents[2], namely:

a.  A "pitch book;"

b.  Renderings of two of the restaurant models;

c.  A combined master Excel spreadsheet called a "Data Pack;"

d.  A series of illustrative development maps entitled "Tim Hortons USA_MinneapolisOpportunity;"

e.  A rationale behind THUSA's increased pricing; and

f.  RBI's most recent quarterly presentation (earnings releases).

42.     A true and correct copy of Goldstein's August 3, 2015 email is annexed hereto as Exhibit C.

43.     Notably, in the FDD provided by Goldstein, acting as THUSA's agent, pages 52-68 were blank and page 51 was blurred so significantly as to be totally unreadable.  The affected

---

[2] These documents are protected by the parties' NDA.

pages effectively scrubbed the Item 19 disclosures from the FDD.  A true and correct copy of the May 2015 FDD provided to Durigon by Goldstein on behalf of THUSA is annexed hereto as Exhibit D.

44.     Conversely, the May 2015 FDD registered with the Minnesota Commerce Department, as required by the Minnesota Franchise Act, Minn. Stat. § 80C.02., is complete and pages 52-68 are intact and present and page 51 is clear and legible.  This document **was not provided to Tim-Minn**.  A true and correct copy of the May 2015 FDD registered with the Minnesota Commerce Department and downloaded from the CARDS search portal is annexed hereto as Exhibit E.

45.     Also on August 3, 2015, in a separate email chain, Goldstein presented three, available U.S. markets for Durigon's consideration: Minneapolis, Michigan, or Cleveland.  A true and correct copy of this email correspondence is annexed hereto as Exhibit F.

46.     Durigon requested more information on the Michigan territory and was informed by Goldstein that THUSA's counsel needed to provide input and guidance on what type and the amount of information THUSA could reasonably provide.  *See* Exhibit F.

47.     On August 12, 2015, Durigon and Goldstein met to discuss the potential deal in broad terms.

48.     Roughly two weeks later, in emails exchanged between August 23, 2015 and August 24, 2015, Durigon and Goldstein discussed certain parameters of the deal from each side's perspective.  A true and correct copy of this email correspondence is annexed hereto as Exhibit G.

49.     Included in that correspondence were Durigon's notes on areas to explore as part of the deal.  A true and correct copy of this document is annexed hereto as Exhibit H.

50.     On August 26, 2015, Durigon and Goldstein met to discuss Durigon's notes. Thereafter, on August 28, 2015, Durigon received the first draft of the ARDA from Tim Brinkley, Vice President & Associate General Counsel for THUSA.   A true and correct copy of this correspondence is annexed hereto as Exhibit I.

51.     Brinkley's email also references an Exclusivity Agreement, which had been requested by Durigon.   At that time, the document was contemplated but not yet available.   *See* Ex. I.

52.     The following day, and thereafter until August 31, 2015, Goldstein and Durigon corresponded regarding the ARDA and putting together a dinner meeting which would also include Elias Diaz ("Diaz"), then-president of Tim Hortons.   In particular, Goldstein desired to know which Tim Hortons employees and/or officers Durigon was targeting to bring into his proposed venture.   A true and correct copy of these email exchanges is annexed hereto as Exhibit J.

53.     On September 3, 2015, Durigon transmitted initial redlines back to THUSA, crafted by Durigon's attorney, Lawrence P. Swistak ("Swistak").   A true and correct copy of this email chain is annexed hereto as Exhibit K.

54.     By way of reply email, Goldstein remarked for the first time that THUSA had not received a signed copy of the FDD's Item 23 receipt as required by the FTC and Minnesota law. *See* Exhibit K.

55.     On September 6, 2015, Durigon transmitted his own redlines for the ARDA to Goldstein.   In the transmitting email, Durigon addressed several issues relating to the burgeoning business relationship with THUSA, including his desire to be partners in the endeavor moving forward.   A true and correct copy of this correspondence is annexed hereto as Exhibit L.

56.     On September 8, 2015, Goldstein requested a teleconference to discuss Durigon and Swistak's redlines.  A true and correct copy of this email correspondence is annexed hereto as Exhibit M.

57.     On September 9, 2015, Durigon and Goldstein spoke via telephone, with Swistak on the line, to go over the two sets of redlines sent to THUSA.

58.     That same day, Goldstein sent an Excel spreadsheet referenced as a "high level equity investment requirement for capex.[3]"  *See* Ex. M.

59.     Goldstein further noted in his email that "we have you building the full schedule for the first year and the majority for the second year.  We also put in 1mm[4] of minimum cash in the assumptions to highlight the total equity need without cash flow generation."  *Id*.

60.     On September 10, 2015, Durigon, Goldstein, Diaz, David Blackmore ("Blackmore"), former President of THUSA, and Felipe Athayde ("Athayde") former Executive Vice President of US Development for Tim Hortons met for dinner in Oakville, Ontario.  At that dinner meeting, several topics were discussed, including (but not limited to): (1) Durigon's intent to hire Paul Barron (Real Estate), Daran Adair (Operations), and Mark Holly (Vice President of Development) from Tim Hortons; and (2) development schedules for the Minnesota buildout.

61.     Diaz had previously had concerns about operations, but Durigon's interest in Adair assuaged those concerns.  However, Diaz was not willing to permit Durigon to hire Holly and suggested Blackmore, instead.

62.     On September 21, 2015, Goldstein emailed Durigon a spreadsheet detailing updated quintiles for Tim Hortons Q1 and Q2 2015.  A true and correct copy of this email is annexed hereto as Exhibit N.

---

[3] Capital Expenditures
[4] $1 million

13

63.     The following day, September 22, 2015, Durigon attended another meeting with Goldstein at Tim Hortons' Oakville headquarters.  Marketing team members attended this meeting as well in order to present Tim Hortons' marketing strategy at a national level.

64.     On September 27, 2015, Durigon visited the Minnesota market and took detailed notes, which were sent to Goldstein the following day, September 28th.  A true and correct copy of this email is annexed hereto as Exhibit O.

65.     A true and correct copy of Durigon's notes are annexed hereto as Exhibit P.

**C.     Negotiations Continue with the Second, Draft ARDA**

66.     On September 27, 2015, Durigon forwards Swistak's redlines for the revised ARDA to Goldstein.  In the transmitting email, Durigon explained his position regarding how he (and eventually Tim-Minn) would run their business.  More specifically, Durigon envisioned a partnership with THUSA, and therefore requested the ARDA be altered to reflect the freedom of Tim-Minn to operate its business free from interference.  A true and correct copy of this email is annexed hereto as Exhibit Q.

67.     On September 29, 2015, Durigon forwarded his own redlines to the second ARDA draft, and in the transmitting email expressed again the need for more flexibility to operate because of the acknowledged lack of familiarity (by both THUSA and Durigon) with the Minnesota market. Durigon further highlighted his commitment to the project (as evidenced by $1 million he would raise towards franchise fees) and again addressed the buildout schedule, which needed more work. A true and correct copy of this correspondence is annexed hereto as Exhibit R.

68.     In particular, Durigon objected to the covenant – as drafted in the ARDA – that he (and his future company) would invest $15 million into the business, but could not distribute

profits for the first 8 years of the ARDA.  Durigon justifiably expressed frustration that THUSA's requirement was not conducive to a fair business relationship.  *See* Exhibit R.

69.     On October 5, 2015, Daniel Edwards, CFE Director of US Development for Burger King (THUSA's sister company, also owned by RBI) emailed Durigon. Edwards advised that, based on Burger King's experience, construction costs in the Minneapolis market were 5-8% above the metrics supplied in the data pack the previous month, depending on location and other site conditions.  A true and correct copy of this correspondence is annexed hereto as Exhibit S.

70.     On October 9, 2015, Goldstein provided an Excel file and supplemental maps detailing numerous potential infill sites in various counties in the Minneapolis region.  A true and correct copy of this email correspondence is annexed hereto as Exhibit T.

71.     Over the next few weeks, the parties continued to negotiate the terms of the ARDA; on October 21, 2015 a meeting was convened at Tim Hortons' headquarters in Oakville to discuss the ARDA.  On October 23, 2015, Durigon received the initial draft of the Exclusivity Agreement. The Exclusivity Agreement, in simplest terms, provided that Durigon had the exclusive right to the Minnesota ARDA through December 18, 2015 in exchange for $50,000.  A true and correct copy of the transmitting email is annexed hereto as Exhibit U.

72.     Goldstein had previously stated THUSA typically did not do exclusivity agreements, which delayed the process. In fact, it was made clear to Durigon that Daniel Schwartz, RBI's CEO, had to personally approve the deal to move it forward and that RBI's general counsel had a hand in drafting the Exclusivity Agreement.  *See* Exhibit U.

73.     On October 27, 2015, Durigon returned his comments on the Exclusivity Agreement, noting several provisions were not in line with what had previously agreed upon.  A true and correct copy of the transmitting email is annexed hereto as Exhibit V.

74.     By November 5, 2015, a revised, draft ARDA was circulated electronically by Tim Brinkley.   Durigon, Goldstein, and the attorneys exchanged emails relating to the ARDA and Exclusivity Agreement throughout that week, as well as resetting the deadline in the Exclusivity Agreement back to accommodate for the delay in finalizing it.   A true and correct copy of this email correspondence is annexed hereto as Exhibit W.

75.     On November 8, 2015, Durigon signaled his acceptance of the terms of the Exclusivity Agreement, but noted changes remained necessary in the ARDA.   A true and correct copy of this email correspondence is annexed hereto as Exhibit X.

76.     On November 12, 2015, Durigon and Athayde exchanged emails relating to Durigon's frustration with the slow progress of completing the Exclusivity Agreement.   Durigon noted he could not bring the deal to his partners for review until it was complete.   Moreover, Durigon advised Athayde – and by extension THUSA – that Deloitte had been retained to review the Data Pack and other aspects of the deal in order to provide an analysis of the business opportunity.   Athayde reiterated RBI's position that it did not favor exclusivity agreements, and noted several key stakeholders had to sign off on the deal, including RBI's CEO and general counsel.   In response, Durigon suggested pushing back the termination date on the Exclusivity Agreement an additional 60 days to provide sufficient time to conduct due diligence.   A true and correct copy of this email exchange is annexed hereto as Exhibit Y.

77.     On November 11, 2015, Goldstein sent updated modeling and Data Pack documents to reflect potential pricing increases for the market and its impact on the P&L.   Durigon shared the updated Data Pack with Deloitte that same day.   A true and correct copy of this correspondence is annexed hereto as Exhibit Z.

78.     Tim-Minn LLC was incorporated on November 13, 2015.

79.     On November 17, 2015 revised, near-final drafts of the ARDA and Exclusivity Agreement were circulated.  Durigon again demanded an additional 60 days to conduct due diligence.  A true and correct copy of this email exchange is annexed hereto as Exhibit AA.

80.     Goldstein and THUSA were aware Deloitte was assisting Tim-Minn with its due diligence, as evidenced by their emails on November 21, 2015.  A true and correct copy of email correspondence from November 21, 2015 is annexed hereto as Exhibit AB.

81.     By November 27, 2015, Deloitte had returned its initial forecast numbers to Durigon, based on the most recent Data Pack.  Daniel Wygodny of Deloitte's Toronto office met directly with Goldstein to explain the numbers around that time.

82.     On November 30, 2015, Durigon and Goldstein exchanged further emails relating to the terms of the Exclusivity Agreement.  Durigon explicitly states "before we sign the ARDA we need a copy of the Franchise Agreement," to which Goldstein replies (in red text) "OK, However there will be no changes to the ARDA once we sign the exclusivity agreement."  A true and correct copy of this correspondence is annexed hereto as Exhibit AC.

83.     Durigon and Tim-Minn were shocked by Goldstein's representation regarding THUSA's unwillingness to negotiate the terms of the Franchise Agreement because Tim-Minn and its officers had, since the inception of the relationship, reasonably believed they would have an opportunity to negotiate the terms of that documents in the same vein as the ARDA and Exclusivity Agreement.

84.     Despite Durigon's demand and Goldstein's agreement to provide the Franchise Agreement before executing the ARDA, no Franchise Agreement was provided.

85.     On December 9, 2015 the fully executed Exclusivity Agreement was fully executed and it was ultimately extended, via amendment to February 22, 2016.

86.     On December 30, 2015, Durigon was provided two, draft registration exemption letters by THUSA through Goldstein; Durigon approved the language on January 3, 2016.  The exemption was ultimately approved by the Minnesota Commerce Department on or about February 19, 2016.

87.     On January 6, 2016, Goldstein told Durigon that the St. Louis Area Developer ("AD") would provide store-level budget figures for his St. Louis locations, but that the P&L for the then-existing restaurants was skewed due to overstaffing because the AD was in the process of opening up new restaurants and was training the staff.  Had the restaurants been at normal staffing levels, it was represented the profits would have been higher for those locations.

88.     Over the next week or so, Goldstein provided additional data to Tim-Minn.  For example, on January 7, 2016, Goldstein sent over the *pro forma* numbers from the St. Louis AD. A true and correct copy of the transmitting email is annexed hereto as Exhibit AD.  On January 13, 2016, Goldstein released average annual value ("AUV") information for three Designated Market Areas ("DMA").  The following day, January 14, 2016, Goldstein provided pricing & menu information ("PMIX") data.  This data was keyed to the Detroit, Columbus, and Buffalo markets.  On January 15, 2016, Goldstein provided sales data from a new St. Louis market store which had opened in late June 2015.  The data showed net sales for the location after six months of more than $748,000.  This was encouraging to Durigon and Tim-Minn.

89.     On February 19, 2016, Goldstein requested Tim-Minn produce the required $1 million deposit (contemplated in the ARDA to be used against franchise fees for Tim-Minn's restaurants as they came on line) ahead of schedule, which was contrary to the express terms of the ARDA.  A true and correct copy of this email correspondence is annexed hereto as Exhibit AE.

90.     On February 25, 2016, Tim Berkley sent Durigon and Tim-Minn an executed copy of the ARDA and Joinder/First Amendment and confirmed receipt of all wired funds.  With that, all conditions in the agreements were met or waived, and Tim-Minn was ready to close the deal and move forward.  A true and correct copy of this email correspondence is annexed hereto as Exhibit AF.

91.     The following day, the ARDA was closed and signed and Goldstein introduced Durigon to THUSA's US area developer support team.  A true and correct copy of the fully executed ARDA is annexed hereto as Exhibit AG.

92.     Among the terms in the ARDA, Tim-Minn was obligated to open roughly 280 Tim Hortons' restaurants over the lifetime of the agreement on a schedule set forth therein.  *See* Exhibit AG.

93.     This development schedule was ultimately unworkable for the reasons set forth below.

**D.      The Delay In Receiving And Executing The Franchise Agreement**

94.     Between February 25, 2016 and September 6, 2016, no progress was made on obtaining a copy of the Franchise Agreement despite repeated requests, as set forth elsewhere herein.  On that date, Durigon emailed Goldstein, Holly, and others at THUSA, rebuking THUSA for its failure to provide franchise agreements for the restaurants it was on the cusp of opening, and only providing a boilerplate copy of a franchise agreement as part of the ARDA process.  A true and correct copy of this email correspondence is annexed hereto as Exhibit AH.

95.     This email exchange highlights Tim-Minn's lack of sophistication with the franchise industry.  *See* Exhibit AH.

19

96.     On or about April 7, 2016, Goldstein emailed Holly a copy of a boilerplate franchise agreement and a new, updated FDD (3/2016).  A true and correct copy of this correspondence is annexed hereto as Exhibit AI.

97.     Upon information and belief, the revised FDD was provided to Tim-Minn in a disguised effort to "re-disclose" Tim-Minn and avoid the prior failure to produce and provide a full FDD which complied with Minnesota law and federal regulations under the FTC Act.  As noted elsewhere herein, the originally-provided FDD was missing key financial information in Item 19 and did not conform with the registered copy on file with the Minnesota Commerce Department.  However, Durigon and Tim-Minn were never advised of THUSA's ulterior motive and were not advised to review the new FDD with counsel.

98.     On October 17 and 18, 2016, Goldstein and Durigon exchanged emails in which Goldstein attempted to "fast-track" the execution of the Franchise Agreement provided weeks earlier, but Durigon was unable to meet on Goldstein's schedule.  Goldstein advised the unsigned Franchise Agreement was "holding up [THUSA's] process" of publishing the next, updated FDD.  A true and correct copy of this email exchange is annexed hereto as Exhibit AJ.

99.     Tim-Minn's attorneys reviewed the proposed Franchise Agreement in good faith and provided recommended changes October 25, 2016; these redlines were forwarded to Goldstein and Athayde on October 26, 2016.  A true and correct copy of the transmitting email is annexed hereto as Exhibit AK.

100.    The following day, October 27, 2016, Durigon and Goldstein exchanged emails in which Goldstein claimed THUSA would not negotiate terms of the Franchise Agreement, while Durigon countered that the Franchise Agreement was provided months after the ARDA and contained numerous provisions in conflict with the terms of the ARDA.  These were addressed by

Tim-Minn's counsel.  Tim-Minn had, to date, spent millions building out the Minnesota territory and was set to open its first slate of restaurants beginning the following month, yet no Franchise Agreement(s) were executed and, critically, THUSA had never provided Tim-Minn an Operations Manual or training materials to ensure the restaurants were run according to system specifications. A true and correct copy of this email exchange is annexed hereto as Exhibit AL.

101.     The parties, through counsel, worked out a compromise position by November 3, 2016, in which THUSA agreed to modify the Franchise Agreement to conform with the ARDA, but would not agree to any further modifications.  Tim-Minn was shocked, having spent more than a year and millions of dollars pushing the project forward, only to be met with unprincipled resistance to reasonable changes at the eleventh hour.

102.     In an email dated November 7, 2016, Durigon – on behalf of Tim-Minn – emailed Goldstein and Athayde expressing Tim-Minn was discouraged by the lack of progress and transparency in negotiating the Franchise Agreement.   Durigon's email further notes that THUSA's refusal to negotiate was contrary to the "spirit of the [ARDA] that we negotiated in good faith," and has led to mistrust between Tim-Minn and THUSA.   More, Durigon reminded Goldstein and Athayde that Tim-Minn was never provided an opportunity to negotiate with THUSA on the terms of the Franchise Agreement, which it found unacceptable on a number of levels.  Durigon requested THUSA take a reasonable approach and meet with Tim-Minn on some essential terminology modifications to the Franchise Agreement in several, key areas where it is in conflict with the ARDA, including but not limited to: cross-termination, transfer of shares, and matters relating to Tim-Minn's expected, future sale of franchised restaurants to independent franchisees under the ARDA.  A true and correct copy of this email correspondence is annexed hereto as Exhibit AM.

21

103.    Ultimately, by early November 2016 Tim-Minn was ready to begin opening Tim Hortons restaurants in its territory and was making a concerted effort to mend any rifts with THUSA and move forward cooperatively, together.  *See* Exhibit AM.

**E.    Tim-Minn Builds Out Its Territory**

104.    Tim-Minn opened the following Minnesota locations under the ARDA: (1) Mall of America, Bloomington (Store No. 6648) on November 13, 2016; (2) Dinkytown (No. 6649) on November 28, 2016; (3) Brainerd (No. 6677) on December 21, 2016; (4) International Falls (No. 6662) on February 17, 2017; (5) East Lake, Minneapolis (No. 6676) on March 26, 2017; (6) Brooklyn Park (No. 6651) on May 5, 2017; (7) Savage (No. 7920) on June 19, 2017; (8) Maplewood (No. 7895) on July 30, 2017; (9) Bemidji (No. 7911) on September 4, 2017; (10) St Cloud (No. 7919) on February 24, 2018; (11) Forest Lake (No. 7893) on April 18, 2018; (12) Treasure Island Center, St. Paul (No. 7929) on May 7, 2018; (13) Brooklyn Center (No. 7924) on August 6, 2018; and (14) Cliff Plaza, Eagan (No. 6652) on November 19, 2018.  They have since been shuttered.

105.    Each of these locations was operated under one of several, wholly-owned limited liability companies.

106.    Tim-Minn had also applied for two, additional sites in August 2018 which THUSA denied because THUSA projected them to be low-sales areas: Apple Valley and Lakeville.  Either of these sites would have satisfied the 15th store required under the development schedule set forth under the ARDA.

107.    After opening the 14 Tim Hortons shops listed above, Tim-Minn was unable to continue expansion because THUSA took an inordinate amount of time to issue formal disapproval letters for its prospective sites.  Tim-Minn's apparent lack of continued growth is, however, not

for lack of trying: Tim-Minn maintained weekly contact with its real estate broker regarding potential sites to build new Tim Hortons units.

108.    However, because of THUSA's unreasonable disapproval of new sites (even when the sales projections appear strong), Tim-Minn was unable to enter negotiations with prospective landlords because they do not wish to mislead a potential business associate, which occurred with the Apple Valley and Lakeville sites.

109.    Consequently, Tim-Minn has no new locations in its development pipeline due to a confluence of factors which include, but are not limited to: (1) lack of funds due to losses across existing locations; (2) sites not receiving THUSA approval; and (3) Tim-Minn's relationships with local landlords has suffered due to THUSA's preemptive (and aborted) suit to enforce the ARDA.

110.    Strikingly, THUSA's refusal to approve the Apple Valley and Lakeville sites was predicated on the sales projections for the market based on *actual numbers* established solely due to Tim-Minn's prior and ongoing operations.

111.    Whereas the 14, prior site approvals were based on the incomplete, misleading, and negligently sourced sales data provided to Tim-Minn in the Data Pack produced by Goldstein at the time Durigon was first disclosed in August 2015 because neither Tim-Minn nor THUSA had actual sales numbers from the preceding year against which they could accurately model.  True and correct copies of these denial letters are annexed hereto as Exhibit AN.

112.    Indeed, Dustin Tremellen, an RBI employee, confirmed the denial at Lakeville was entirely due to the low sales projection.

113.    However, the denial cost Tim-Minn goodwill because THUSA had participated in the site plan and elevations with the Lakeville property owner, only to pull the plug after obtaining concessions and giving all indications to the landlord – a third party – the site was likely to be

23

approved. A true and correct copy of the email correspondence surrounding these conversations is annexed hereto as Exhibit AO.

114. Tim-Minn requested a second review the Lakeville, but Tremellen did not do so; on a telephone call he verbally advised Tim-Minn "don't bother" trying to push the site because it would not be approved..

115. THUSA's refusal to work with Tim-Minn on sites due to the fault in THUSA's projected financial disclosures – which Tim-Minn relied upon to its detriment – has imperiled continued development in the territory and may result in a breach of the ARDA[5], which Tim-Minn has attempted in good faith to avoid.

116. As these difficulties mounted, THUSA filed a pre-emptive and utterly unnecessary lawsuit which severely and negatively impacted Tim-Minn's relationships with local property owners and has continued to be one of the prime reasons behind Tim-Minn's difficulty opening successive locations.

**F.      THUSA Fails to Perform Under the ARDA**

117. Among the many terms of the ARDA, THUSA was obligated to provide to Tim-Minn numerous documents, including but not limited to: (1) a copy of the then-current Tim Hortons Franchise System Operations Manual ("Operations Manual"); (2) a copy of the then-current Tim Hortons Franchise System Development Manual ("Development Manual"); and (3) a copy of the then-current Tim Hortons Franchise System Employee Training Manual ("Training Manual").

118. THUSA did not provide copies of its Operations Manual, Development Manual, or Training Manual to Tim-Minn at any time prior or subsequent to the execution of the ARDA.

---

[5] As amended.

119.     As a result, Tim-Minn was forced to develop its own training program and operations manual virtually from scratch.  Tim-Minn did not receive the benefit of its bargain.

120.     In addition, THUSA promoted the Tim Hortons Brand Standards system, which was not designed for, and therefore incompatible with, the entrance into a wholly new market with no brand recognition.  This negatively impacted Tim-Minn's (and its franchised restaurants') day-to-day operations, causing them to lose a substantial amount of money.

121.     Further, under the terms of the Amended ARDA, THUSA was obligated to invest in marketing the Tim Hortons brand to the Minnesota market on behalf of Tim-Minn.  However, THUSA spent carelessly and interfered with the marketing agencies it hired to do the work.  In two, separate instances, agencies dropped the account – after being paid – because THUSA refused to take into account local conditions and needs.  Instead THUSA insisted on a marketing strategy not tuned to the Minnesota marketplace.  This cost Tim-Minn roughly $650,000 of the $1.5 million budget set forth in the ARDA.

122.     More, Tim-Minn came to learn the equipment package (Schedule A to the ARDA) was incomplete, misleading, and in several instances contained inconsistent information.  That is to say, identical equipment was priced differently between Tim Hortons shops and Tim-Minn learned THUSA was selling it old equipment at current market value for new equipment.  In addition, THUSA was obligated to discount the scheduled prices for the first, two restaurants Tim-Minn was opening (as set forth above) but those discounts were not applied properly, if at all.

123.     These additional, unexpected costs reduced Tim-Minn's cash flow, which were further exacerbated by THUSA and RBI's finance team wrongful and unauthorized withdrawal from Tim-Minn's accounts.

21314715v1

124.     As but a few examples, RBI, on behalf of THUSA, carelessly withdrew money from incorrect accounts, charged Tim-Minn royalty fees not reflected in the Amended ARDA and charged fees due to other developers in other markets, causing Tim-Minn damages including, but not limited to, diminished cash flow for several restaurants and/or accounts owned by Tim-Minn.

125.     THUSA failed to provide Tim-Minn access to "TimTrac" an online management platform represented by THUSA to be a streamlined portal to connect people from each organization assigned to a given project/market.  TimTrac was represented by THUSA to be an invaluable resource in the development of Tim-Minn's franchise sites and the Minnesota market. However, TimTrac access was withheld for several months, until October 2016 when THUSA eventually provided limited access to the system. Tim-Minn was told there were legal hurdles to providing access, which further delayed deployment of the software.  As a result, Tim-Minn was forced to begin construction and, in some cases complete, restaurants without the use of TimTrac because it had no choice.  Ultimately, the THUSA's lack of organization and ability to follow-through on its own processes did delay the opening of one location because the needed Schedule A was not processed in a timely manner.

126.     Finally, RBI employee and officer turnover contributed to a significant number of communication issues which were never satisfactorily resolved in areas from operations to construction management.

127.     By May 2017, Tim-Minn reached out to RBI and requested an amended ARDA to accommodate the numerous missteps, failures, and unanticipated difficulties.  It was, at that point, clear to Tim-Minn that, had THUSA provided accurate information in the Data Pack, Tim-Minn would never have executed the ARDA.

21314715v1

G.     **THUSA Negotiated the Amended ARDA in Bad Faith**

128.     Beginning in May 2017, and continuing for several months, Tim-Minn, THUSA, and RBI negotiated an amended ARDA.

129.     At the time, the Tim Hortons brand standards were not workable or a new market, such as the Minnesota market, as noted elsewhere herein.

130.     Tim-Minn requested the development schedule be modified in order to recoup its unanticipated losses because the due diligence it had conducted prior to executing the ARDA was based on faulty, misleading, and inaccurate financial representations provided by Goldstein on behalf of THUSA.

131.     In addition, the royalty schedule in the ARDA was unworkable due to the real-world economics in the Minnesota market, a reality THUSA had no experience with and failed to prepare Tim-Minn for and for which Tim-Minn could not reasonably be prepared given the financial data provided by Goldstein.

132.     Moreover, in an email sent from Durigon to Goldstein on July 18, 2017, Durigon noted that THUSA's failure to provide adequate marketing materials, training materials, and operations materials, as well as the foregoing financial missteps and miscues, cost Tim-Minn "millions of dollars getting a footing in the new market and educating THUSA on what needs to be done in order to be successful in Minnesota, because you acknowledged your mistakes…"  A true and correct copy of this correspondence is annexed hereto as Exhibit AP.

133.     Between July and October 2017, numerous emails were exchanged by Tim-Minn and Goldstein, and the amended ARDA took shape.  *See* Exhibit AP.

134.     There were numerous issues to be negotiated, not the least of which THUSA's insistence on paying out the existing Schedule A in full, but (and as noted above) the invoicing

was inconsistent and Tim-Minn began to understand THUSA was acting in bad faith and taking advantage of its relative inexperience with the system.

135.     These inefficiencies and errors led to construction delays which caused Tim-Minn to expend additional capital re-mobilizing general contractors on construction projects and, in some case, pay delay damages to contractors.

136.     For example, Cliff Plaza was delayed weeks because Tremellen and RBI failed to initiate the process of putting a Schedule A package together for that location – a 6-10 week turnaround.  The project general contractor could not commence construction and Tim-Minn was stuck paying rent on an unusable site, which in turn meant the restaurant opened at a loss.  Tim-Minn's Brooklyn Center location suffered similar delays and costs; other locations suffered from similar, if less drastic delays and cost overruns.

137.     On December 4, 2017, Goldstein emailed Durigon and demanded the Amended ARDA be executed "by end of today."  A true and correct copy of this email correspondence is annexed hereto as Exhibit AQ.

138.     The following day, Durigon emailed Goldstein to advise the Amended ARDA would be signed by Tim Minn and an executed copy was forwarded to Goldstein at 5:48 PM.  *See* Exhibit AQ.

139.     On December 5, 2017[6], the Amendment to Area Representative and Development Agreement ("Amended ARDA") was executed by Durigon on behalf of Tim-Minn.  Notably, Tim-Minn's obligation to open Tim Hortons restaurants was reduced to roughly 190 units over the lifetime of the ARDA, which was still an overwhelming target based on THUSA's failure to

---

[6] The Amended ARDA is dated December 1, 2017, but it was not signed until December 5, 2017.

properly market the territory and invest in public awareness of the Tim Hortons brand.  A true and correct copy of the Amended ARDA is annexed hereto as Exhibit AR.

140.     The Amended ARDA modifies and replaces language relating to, among other things, royalties, development schedules, and other issues which had plagued the original ARDA. *See* Exhibit AR.

141.     In addition to the foregoing, the Amended ARDA includes a "General Release" which violates the MFA.  The General Release states, in pertinent part:

> 11.     GENERAL RELEASE. For and in consideration of THUSA entering into this Agreement, and other good and valuable consideration received from or on behalf of THUSA, the receipt of which is hereby acknowledged, Developer, for itself and on behalf of itself of each Affiliate, hereby remises, releases, acquits, satisfies, and forever discharges THUSA, its officers, directors, agents, employees, affiliates, subsidiaries, parent corporation, and all of their assignees (individually and together "THUSA"), of and from all manner of claims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, and executions whatsoever, in law or in equity, which Developer or any Affiliate ever had, now has, or which any successor or assign of Developer or any Affiliate hereafter can, shall, or may have, whether known or unknown, against THUSA for, upon, or by reason of any matter, cause, or thing whatsoever, from the beginning of the world to the date of this Agreement.

*See* Exhibit AR.

142.     The purpose of the General Release is clear and unambiguous: THUSA desired to whitewash its prior violations of Minnesota law by unlawfully and improperly obtaining Tim-Minn's release of its valid claims under the MFA and Minnesota law.  This flies in the face of the express non-waiver provision contained in Minn. Stat. § 80C.21.

143.     More specifically, Minn. Stat. § 80C.21 prohibits franchisors from requiring franchisees to waive rights under the MFA at the time the franchise agreement is executed. Minnesota court have recognized that § 80C.21 is broadly interpreted to prevent just this sort of attempt by a franchisor to limit its liability for misrepresentations in the context of selling franchises to prospective franchisees.

144.    Strikingly, the same day THUSA initiated a lawsuit in the District Court for the Southern District of Florida, bearing Case No. 1:17-cv-24395-FAM, against *seven* of Tim-Minn's wholly-owned LLCs for alleged violations of the ARDA.

145.    Goldstein and THUSA had bargained in bad faith to obtain a signature on the Amended ARDA and, despite receiving what they demanded, they filed an unnecessary and moot lawsuit regardless.

146.    Outrageously, the suit held the St. Cloud and Forrest Lake restaurants in limbo: despite the fact that both locations were fully constructed, they sat empty and bereft of equipment for roughly four months, during which time Tim-Minn was forced to pay its General Contractor for its work, as well as rent for the locations, and labor costs for a trained, ready workforce with nowhere to actually work.  This, alone, significantly diminished available cash flow for Tim-Minn.

147.    The suit was withdrawn without prejudice pursuant to *Fed. R. Civ. P.* 41(a)(1)(A)(i) on December 11, 2017, but only after THUSA held Tim-Minn ransom on a Schedule A payment, and an Order of Dismissal was issued on December 27, 2017.

148.    The suit had far-reached effects, including but not limited to repeated, continuous, and continuing fallout with Minnesota property owners who were aware of the litigation and became leery of getting into business with Tim-Minn and its subsidiaries thereafter.  As but one example, Tim-Minn's real estate broker, Colliers International, caught wind of the suit when a local news organization, the Star Tribune, published an article online and in print about it.  Colliers reported at least one landlord had called with questions about the article, and others were expected. A true and correct copy of this email correspondence is annexed hereto as Exhibit AS.

149.     Holly forwarded the Colliers email to Goldstein, expressing concern about the negative feedback from the suit and article and identifying the impact to Tim-Minn's business. Goldstein admitted the suit was "a major f--- up." *See* Exhibit AR.

**H.     The ARDA Is A Franchise Agreement**

150.     Tim-Minn and THUSA have executed a series of agreements, including the ARDA and the Amended ARDA.  Each of these agreements was reduced to a writing executed by the parties and for which valid consideration was given by both sides.  With respect to the Exclusivity Agreement and ARDA, RBI had significant input in the drafting of both, as well as assisting THUSA's performance of its obligations thereunder.

151.     To be clear, the February 25, 2016 ARDA between Tim-Minn and THUSA *is* a franchise agreement.  § 16.1 states unambiguously that "[*i*]t *is expressly agreed that the Parties intend by this Agreement to establish between them the relationship of franchisor and franchisee*.")

152.     Minnesota requires franchisors to register their FDDs and Franchise Agreements prior to offering same for sale.  *See* Minn. Stat. § 80C.02, 80C.04.

153.     Upon information and belief, THUSA registered its FDD – and has regularly updated its FDD in accordance with Minnesota and federal law – regularly for several years and the FDD was validly registered with the Commerce Department at the time it was disclosed to Tim-Minn.

154.     Despite the foregoing, the ARDA between Tim-Minn and THUSA was not the typical franchise sold in Minnesota – in fact it was at the time the only area development franchise agreement THUSA had contemplated in Minnesota and THUSA attempted to obtain a registration waiver under Minn. Stat. §80.03(g) because the ARDA was not registered with the Commerce

Department as required under the MFA.

155.    THUSA's failure to properly disclose Tim-Minn by using an adulterated FDD was and is not excused by the exemption of the ARDA from registration in Minnesota.

**I.      THUSA's Improper Pricing Model**

156.    In addition to the foregoing malfeasance, THUSA has violated the terms of its FDD and Franchise Agreement(s) by selling products to Tim-Minn, on behalf of its franchised restaurants, at unreasonable markups.

157.    THUSA is Tim Hortons' US-based franchisor.

158.    Specifically, at Item 8 of the May 2015 FDD on which Tim-Minn was disclosed, Tim Hortons (and by extension, THUSA) states:

> …you must purchase or lease all products, fixtures, furnishings, building components, equipment, décor, signs, paper goods, containers, cartons, packaging, supplies, and smallwares and other utensils, services, including project management services, product ingredients, insurance and other items installed in used, or sold by the Shop ("**Items**") solely from suppliers who have been approved by us and all these Items must meet our specifications.  We can designate ourselves, our affiliates, or a third party as the sole supplier for any Item. … We and our affiliates may charge what we consider to be a ***reasonable mark-up*** (*emphasis added*) on items sold to you.

159.    The FDD further notes that Tim Hortons "estimate[s] that the purchase from approved suppliers will represent approximately 100% of your total purchases…"

160.    According to the FDD and upon information and belief, THUSA purchases numerous items from approved suppliers, then sells it to a wholly owned entity, The TDL Group Corp. ("TDL").    TDL is the franchisor for Tim Hortons Canadian businesses and has approximately 3,700 Tim Horton "Shops" franchised in that country.

161.    TDL, in turn, sells these supplies and goods to a distributor, which, in turn, sells the items to franchisees and franchisee guarantors like Tim-Minn.  TDL also sells Canadian equipment

to U.S. companies/distributors without adequate details on exchange rates and CAD and/or US taxes.

162.    TDL and THUSA acknowledge they "will derive revenue from sales of Selected Goods and Articles to" the distributors, who, in turn, profit on the sale to Plaintiff.

163.    Notwithstanding the foregoing, THUSA represented to Tim-Minn that any charges it and its affiliates make would be "reasonable."  However, in practice, those charges are not "reasonable" by any metric – and this is by design.

164.    Tim-Minn was required to operate their Tim Hortons franchised shops pursuant to the policies and procedures established by Defendants for the operation of a Tim Hortons franchise shop.

165.    In particular, Tim-Minn was required to purchase inventory, supplies and equipment from the vendors specified by Defendants to operate their Tim Hortons shops.

166.    THUSA abandoned the specific representations in the May 2015 FDD provided to Tim-Minn that only "reasonable" profits would be made on required purchases of products and services from either Tim Hortons directly or its approved suppliers.[7]  In fact, the prices paid by Plaintiff for supplies from THUSA directly or from an "approved supplier" were grossly increased, permitting THUSA to wrongfully obtain additional income.

167.    While THUSA represented it will take a "reasonable" profit on the sale of certain items, it has failed to limit itself to "reasonable" profits on numerous products and supplies.

168.    For example, and upon information and belief THUSA charges Tim-Minn in excess of $104.08 per case *more* for Applewood bacon than Wendy's franchisees will pay for the identical product. Tim Hortons' franchisees also pay $23.85 *more* for boxes of diet and regular Coke; $10.92

---

[7] Item 8 "Restrictions On Sources of Products and Services", FDD page 26: "We and our affiliates may charge only what we consider to be a reasonable mark-up on items sold to you."

*more* for a case of medium, large, or extra-large vinyl gloves; $11.92 *more* for a case of 9-inch

plastic straws; and $9.53 *more* for a 50 count of register thermo tape than do Wendy's franchisees.

Other examples include charging double for credit card processing fees.

169.    THUSA's scheme to profit off of Tim-Minn is an unconscionable business practice

insofar as it is disguised and intentionally not properly disclosed to Tim-Minn, in violation of the

MFA.

170.    Tim-Minn would not have entered into franchise agreements with THUSA had the

true nature of these so-called "reasonable" mark-ups been made apparent.

171.    THUSA exploited the fact that there exists a substantial imbalance of power

between it and Tim-Minn, which imbalance allowed Tim-Minn to implement this business

scheme.

## COUNT I
## VIOLATION OF THE MINNESOTA FRANCHISE ACT,
### Minn. Stat. § 80C.01 *et seq.*

172.    Plaintiff repeats and realleges Paragraphs 1 through 171 as if set forth fully herein.

173.    Minnesota has passed strong, remedial legislation intended and designed to protect

Minnesota franchisees from unfair contracts and abuses by franchisors: the Minnesota Franchise

Act ("MFA")

174.    Tim-Minn is a "franchisee," a "subfranchisor" and an "area franchisee" as those

terms are defined under the MFA. *See* Minn. Stat. § 80C.01(Sub 5, 7, 8).

175.    THUSA is a franchisor as that term is defined under the MFA. *See* Minn. Stat. §

80C.01 (sub. 6).

176.    The MFA requires franchisors who sell franchises in Minnesota register their

"offering circular" with the Commerce Department, and any franchisee sold a franchise in

Minnesota must be provided a copy of the registered, state-approved offering circular. *See* Minn. Stat. §§ 80C.02, 80C.05, 80C.06.

177.    Each application for registration must contain a full "public offering statement" which meets the requirements of the MFA. *See* Minn. Stat. § 80C.04.

178.    A properly-formulated FDD (as required under the FTC Franchise Rule) meets the requirements of § 80C.04, with some state-specific additional disclosures.

179.    Minnesota does not require franchisors to include financial representations in their offering circulars.

180.    However, it is a prohibited practice under the MFA for any person to sell or offer for sale a franchise by means of any untrue statement of material fact or omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. *See* Minn. Stat. § 80C.13, Subd. 2.

181.    At all times relevant hereto, THUSA had a validly registered offering circular (or FDD) on file with the Commerce Department. At the time Tim-Minn became interested in a Minnesota area development agreement, the active and most current offering circular was THUSA's May 2015 FDD. *See* Exhibit D.

182.    However, the FDD provided to Tim-Minn was incomplete: the financial disclosures contained at Item 19 of the FDD were obscured and/or omitted and removed entirely.

183.    Instead, THUSA provided to Tim-Minn copious amounts of profit and loss statements from area developers around the United States, as well as the documents identified in Paragraph 44 above.

184.    The financial representations provided to Tim-Minn by THUSA were false, misleading, and deceptive in violation of the MFA and the rules promulgated thereunder. *See, e.g.*

*Minn. Admin. Rule* § 2860.4500.

185.    Failure to abide by the MFA entitles franchisees to monetary damages and other relief.  *See* Minn. Stat. § 80C.17.

186.    Tim-Minn relied upon the false, misleading, and/or deceptive financial representations provided by THUSA – as noted elsewhere herein, Tim-Minn retained Deloitte to create financial forecasts based upon the financial disclosures provided by THUSA and made its decision to invest millions of dollars in the Tim Hortons system based on the Deloitte reports.

187.    The Minnesota market has proven to be demonstrably different from the data provided by THUSA, such that Tim-Minn has lost a considerable amount of money as a result of the incorrect forecasting based almost entirely upon THUSA's provided data.

188.    As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

## COUNT II
## VIOLATION OF THE MINNESOTA FRANCIHSE ACT,
Minn. Stat. §80C.13, Subd. 2

189.    Plaintiff repeats and realleges Paragraphs 1-188 as if set forth fully herein.

190.    As set forth in detail in the preceding paragraphs, THUSA did produce and register a certain FDD with the State of Minnesota in May 2015.

191.    This FDD was provided – in adulterated form, as set forth above – to Tim-Minn (in the person of Durigon, acting on behalf of Tim-Minn.)[8]  More specifically, the FDD provided to Durigon as part of the initial disclosure was missing several pages from the Item 19 disclosures, which were included the May 2015 FDD registered with the Minnesota Commerce Department.

192.    The FDD, at Item 8, represents, *inter alia*, that THUSA will charge a "reasonable"

---

[8] Tim-Minn was not yet an existing entity, but was contemplated by Durigon at that time and all actions undertaken by Durigon were done in furtherance of the then-to-be-created entity, Tim-Minn.

markup of goods it requires franchisees – like Tim-Minn – to purchase from either THUSA directly, or one of its approved vendors.

193.     In practice, however, the markups on items and goods sold to Tim-Minn were objectively unreasonable: in some cases Tim-Minn was charged, upon information and belief, between 20-50% above market rate for necessary items it was contractually prohibited from purchasing through another source.

194.     Given the fact that THUSA's markups on items Tim-Minn needed to purchase from it, or its approved suppliers, were not unreasonable, THUSA's FDD contains an untrue – or at minimum exceptionally misleading – statement of material fact in violation of Minn. Stat. §80C.13, Subd. 2.

195.     Moreover, such misleading and objectively untrue statements represent an unfair and inequitable practice under Minn. Stat. §80C.14, Subd. 1 and 2, as well as *Minn. Admin. Rule* 2860.4400 (G).

196.     Tim-Minn has been damaged by these material misrepresentations and false statements insofar as it has been forced to spend thousands of dollars over market to line THUSA's coffers in an amount to be established at trial.

## COUNT III
## VIOLATION OF THE MINNESOTA FRANCHISE ACT,
Minn. Stat. §80C.21

197.     Plaintiff repeats and realleges Paragraphs 1-196 as if set forth fully herein.

198.     THUSA included a General Release with the Amended ARDA which it forced Tim-Minn to sign under threat of litigation and termination of the ARDA and loss of its business.

199.     The General Release violates the express language of Minn. Stat. § 80C.21 insofar as it purports to act as a waiver of rights Tim-Minn is entitled to under the MFA, including but not

limited to, Tim-Minn's right to bring claims against THUSA for misrepresentation in connection with the original sale of its franchises.

200.     This represents a prohibited act under applicable Minnesota law and regulation.

201.     Tim-Minn has been damaged by these material misrepresentations and false statements insofar as it has been forced to spend thousands of dollars over market to line THUSA's coffers in an amount to be established at trial.

**COUNT IV**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

202.     Plaintiff repeats and realleges Paragraphs 1 through 201 as if set forth fully herein.

203.     The franchise agreement between THUSA and Tim-Minn gives rise to express obligations and also gives rise to a mutual implied covenant of good faith and fair dealing between the parties.

204.     Under this covenant, each party has an obligation and duty to act fairly towards the other, to do nothing destructive of the other party's right to enjoy the fruits of the contract, and to do everything that the contract presupposes they will do to accomplish its purpose.

205.     The obligations of THUSA to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between THUSA and Tim-Minn.

206.     THUSA failed to act in good faith and deal fairly with Tim-Minn because it provided incomplete, incorrect, and misleading financial information to Tim-Minn and in so doing it sought to insulate itself from liability by appending invalid disclaimers to those financial representations.

207.     THUSA's financial representations carry with them language which appear to be SEC Safe Harbor disclaimers: however, Tim-Minn is and was not an investor and the SEC

38

disclaimers do not eliminate THUSA's obligation to fully, fairly, and completely disclose financial data once it had chosen to do so.

208.   Tim-Minn reasonably and justifiably relied upon THUSA's disclosures to its detriment, spending millions of dollars on an area development deal it never would have entered had it been provided an accurate picture of the financial needs of the territory.

209.   As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

## COUNT V
## FRAUD

210.   Plaintiff repeats and realleges Paragraphs 1 through 209 as if set forth fully herein.

211.   As stated elsewhere herein, THUSA provided false and misleading financial information to Tim-Minn in connection with its effort to sell an area development agreement (the ARDA) to Tim-Minn.

212.   THUSA's false, misleading, and incomplete financial disclosures were known by THUSA to be false, misleading, and/or incomplete at the time they were disclosed to Tim-Minn. As evidence hereof, THUSA knowingly appended invalid SEC Safe Harbor disclaimers to its disclosures in a naked attempt to insulate itself from liability.

213.   THUSA took advantage of Tim-Minn and Durigon, knowing they lacked sophistication and experience in the quick service restaurant industry and the Minnesota market.

214.   Tim-Minn reasonably and justifiably relied upon the representations of its franchisor to its detriment.

215.   As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

21314715v1

## COUNT VI
## NEGLIGENT MISREPRESENTATION

216.    Plaintiff repeats and realleges Paragraphs 1 through 215 as if set forth fully herein.

217.    THUSA owed Tim-Minn a duty of care, specifically a duty to provide accurate and complete financial data as required by the MFA and common law of Minnesota.

218.    THUSA supplied financial data to Tim-Minn for Tim-Minn to use as guidance and modeling as part of the parties' business transactions.

219.    Tim-Minn was justified in its reliance upon the THUSA-supplied financial data.

220.    The THUSA-supplied data was false and misleading.

221.    THUSA failed to exercise reasonable care and/or competence in collecting and disseminating the financial performance data it supplied to Tim-Minn.

222.    As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

## COUNT VII
## BREACH OF CONTRACT

223.    Plaintiff repeats and realleges Paragraphs 1-222 as if set forth fully herein.

224.    The ARDA, as Amended, is a valid, binding contract between Tim-Minn and THUSA.

225.    The FDD Tim-Minn was disclosed on (the May 2015 adulterated version) is specifically incorporated into the ARDA and is binding on both parties.

226.    THUSA breached the franchise agreement with Tim-Minn by, among other things, breaching the express contractual representation in the FDD that it would only charge "reasonable" mark-ups on products and supplies required to bed purchased from Tim Hortons or its designated affiliate.

227.    Defendants' express breaches of the ARDA are a substantial factor in causing Tim-Minn's damages.

228.    As a result of the foregoing, Tim-Minn is entitled to damages to be established at trial.

**COUNT VIII**
**UNJUST ENRICHMENT**

229.    Plaintiff repeats and realleges Paragraphs 1-228 as if set forth fully herein.

230.    Defendant has, by virtue of the ARDA signed by Tim-Minn, received thousands of dollars in payments from the unreasonable mark-ups imposed on goods and services required by THUSA for use in the franchisees' shops.

231.    The money received by THUSA from these mark-ups was unconscionably obtained because Defendants' unreasonably aggregate through middlemen which causes additional costs to be passed down the chain to the franchisees, such as Tim-Minn.

232.    Defendant has, therefore, received from Plaintiff an income benefit through inflated mark-ups.

233.    THUSA has a pecuniary interest in milking as much money from Tim-Minn as possible via these unreasonable mark-ups and effectively holds it hostage to these exorbitant fees because it is bound, by the ARDA and individual franchise agreements for its franchised shops, to purchase necessary items solely from Defendant.

234.    THUSA has additional leverage: franchisees (such as Plaintiff) cannot choose outside suppliers for these necessary items because to do so would violate their respective franchise agreements and could result in termination of their franchises.

235.    Effectively, Defendant has Tim-Minn captive and knowing this is so, gouge them to an unreasonable and prohibitively expensive degree.

41

236.    By virtue of these actions, Tim-Minn has been damaged in an amount to be established at trial.

**COUNT IX**
**BREACH OF CONTRACT**

237.    Plaintiff repeats and realleges Paragraphs 1-236 as if set forth fully herein.

238.    The ARDA, as Amended, is a valid, binding contract between Tim-Minn and THUSA.

239.    Under the terms of their agreement, THUSA, was obligated to perform certain obligations, including but not limited to providing training and operational support and manuals to Tim-Minn, providing access to proprietary computer systems such as TimTrac, and to ensure Tim-Minn had what it needed to meet its own obligations under the terms of the ARDA and/or Amended ARDA, as well as the various franchise agreements signed by Tim-Minn's wholly-owned subsidiary entities in order to operate Tim-Minn's network of Tim Hortons shops.

240.    THUSA failed to perform their numerous obligations under the terms of the various agreements in effect between the parties.

241.    This failure to perform made it impossible for Tim-Minn (or its subsidiaries) to perform their own obligations due to the fact that Tim-Minn's performance was often contingent upon THUSA's performance, which was constantly delayed or wholly defaulted.

242.    As a direct and proximate result of THUSA and RBI's breach of the various contracts, Tim-Minn has been damaged in an amount to be established at trial.

**COUNT X**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

243.    Plaintiff repeats and realleges Paragraphs 1-242 as if set forth fully herein.

244.    The franchise agreement between THUSA and Tim-Minn gives rise to express

42

obligations and also gives rise to a mutual implied covenant of good faith and fair dealing between the parties.

245.    Under this covenant, each party has an obligation and duty to act fairly towards the other, to do nothing destructive of the other party's right to enjoy the fruits of the contract, and to do everything that the contract presupposes they will do to accomplish its purpose.

246.    The obligations of THUSA to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between THUSA and Tim-Minn.

247.    THUSA failed to act in good faith and deal fairly with Tim-Minn because THUSA undermined Tim-Minn's ability to meet its development schedule by filing an unnecessary, preemptive lawsuit in the Southern District of Florida which, as a public record, was the subject of published journalism and much comment in the Minnesota market where Tim-Minn conducts its business.

248.    This unnecessary and wasteful lawsuit – dismissed less than a week after it was filed in admitted error – caused and continues to cause unnecessary and expensive delays in Tim-Minn's development schedule because local property owners are unwilling to deal with Tim-Minn on terms which are fiscally responsible for Tim-Minn, whereas prior to the suit Tim-Minn was able to stay within budgetary parameters more easily and find workable compromises with local real estate ownership.

249.    As a direct and proximate result of THUSA's breach of the various contracts, Tim-Minn has been damaged in an amount to be established at trial.

**WHEREFORE**, and for the reasons set forth elsewhere herein, Plaintiff Tim-Minn, Inc. is entitled to judgment on the foregoing Counts of this Complaint in the form of:

A.    Compensatory damages;

21314715v1

B.      Actual damages;

C.      Punitive damages;

D.      Statutory damages;

E.      Attorney's fees;

F.      Costs of suit; and

G.      Any and all other such relief as this Court deems just and equitable under the circumstances.

Dated: August 29, 2019                     Respectfully Submitted,

                                           BOWMAN AND BROOKE LLP


                                           By: /s/Steven L. Reitenour
                                              Richard G. Morgan (#157053)
                                              richard.morgan@bowmanandbrooke.com
                                              Steven L. Reitenour (#225691)
                                              steve.reitenour@bowmanandbrooke.com
                                           150 South Fifth Street, Suite 3000
                                           Minneapolis, Minnesota  55402
                                           Telephone: (612) 339-8682
                                           Facsimile: (612) 672-3200

                                           MARKS & KLEIN, LLP
                                           Gerald A. Marks, admitted *pro hac vice*
                                           jerry@marksklein.com
                                           Steven T. Keppler, admitted *pro hac vice*
                                           steven@marksklein.com
                                           63 Riverside Avenue
                                           Red Bank, New Jersey 07701
                                           Telephone: (732) 747-7100
                                           Facsimile:  (732) 219-0625



## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues raised in this pleading.

21314715v1