## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF FLORIDA

TIM-MINN, INC., a Minnesota Corporation and BEMIDJI - 100 PAUL BUNYAN DRIVE SOUTH - 7911 LLC, a Minnesota incorporated entity, BRAINERD - 520 W WASHINGTON STREET - 6677, LLC, a Minnesota incorporated entity, BROOKLYN CENTER - BROOKLYN BOULEVARD - 7924 LLC, a Minnesota incorporated entity, DINKYTOWN - 14TH AVENUE - 6649 LLC, a Minnesota incorporated entity, EAGAN - CLIFF ROAD - 6652 LLC, a Minnesota Incorporated Entity, MINNEAPOLIS - 3600 E LAKE STREET - 6676 LLC, a Minnesota incorporated entity, FOREST LAKE - 12TH STREET 7893 LLC, a Minnesota incorporated entity, INTERNATIONAL FALLS - 2ND AVENUE - 6662 LLC, a Minnesota incorporated entity, BLOOMINGTON - MALL - 6648 LLC, a Minnesota incorporated entity, MAPLEWOOD - 2158 RICE STREET - 7895 LLC, a Minnesota incorporated entity, SAVAGE - HWY 13 SOUTH - 7920 LLC, a Minnesota incorporated entity, ST CLOUD - ROOSEVELT ROAD - 7919 LLC, a Minnesota incorporated entity, SAINT PAUL - WABASHA STREET - 7929 LLC, a Minnesota incorporated entity, and BROOKLYN PARK - 8500 XYLON AVENUE 6651 LLC, a Minnesota incorporated entity,

Civil No.: 1:20-cv-23481-KMW

Plaintiffs,

v.

TIM HORTONS USA, INC.

Defendant.

## FOURTH AMENDED COMPLAINT

Plaintiff, TIM-MINN, INC., ( "Tim-Minn"), BEMIDJI - 100 PAUL BUNYAN DRIVE

SOUTH - 7911, LLC ("Bemidji"), BRAINERD - 520 W WASHINGTON STREET - 6677, LLC,

("Brainerd"), BROOKLYN CENTER - BROOKLYN BOULEVARD - 7924 LLC, ("Brooklyn

Center"), DINKYTOWN - 14TH AVENUE - 6649 LLC("Dinkytown"), EAGAN - CLIFF ROAD - 6652 LLC, ("Cliff Plaza"), MINNEAPOLIS - 3600 E LAKE STREET - 6676 LLC, ("East Lake"), FOREST LAKE - 12TH STREET 7893 LLC, ("Forest Lake"), INTERNATIONAL FALLS - 2ND AVENUE -6662 LLC, ("International Falls"), BLOOMINGTON - MALL - 6648 LLC, ("MOA"), MAPLEWOOD - 2158 RICE STREET - 7895 LLC, ("Maplewood"), SAVAGE - HWY 13 SOUTH - 7920 LLC, ("Savage"), ST CLOUD - ROOSEVELT ROAD - 7919 LLC ("St. Cloud"), SAINT PAUL - WABASHA STREET - 7929 LLC, ("Go Wild"), and BROOKLYN PARK - 8500 XYLON AVENUE 6651 LLC, ("XYLON"), (collectively,  "Plaintiffs"), by and through their attorneys, bring this action against Defendant, TIM HORTONS USA, INC. ("THUSA" or "Defendant"), and states:,

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs invested millions of dollars in bringing the Tim Hortons brand to Minnesota, only to learn too late that THUSA had employed misleading, unlawful and fraudulent financial representations to induce Plaintiffs into making a substantial the investment in violation of 16 C.F.R. Part 16 (the "FTC Franchise Rule") and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq*. ("FDUTPA").

2.      THUSA provided false, misleading, and fraudulent financial representations to Tim-Minn outside of the confines of their Franchise Disclosure Document ("FDD"), which were materially different from the financials provided to the State of Minnesota, Commerce Department, in connection with the registration of that FDD as required under the Minnesota Franchise Act ("MFA") Minn. Stat. § 80C.01 *et seq*.  The FDD Tim Hortons provided to Plaintiffs was missing the complete Item 19 financial performance representations.

3.      These intentional and fraudulent misrepresentations and omissions from the FDD combined with the materially altered financials provided by THUSA to Plaintiffs were and are

violations of FDUTPA incorporates the FTC Franchise Rule to provide that any violation of the FTC Franchise Rule is a *per se* violation of Florida's law protecting consumers such as Plaintiffs from unfair and deceptive practices employed by THUSA.

4.      THUSA's false, misleading, and/or fraudulent financial representations were used to induce Plaintiffs into agreeing to develop THUSA's business in the State of Minnesota, a new market for the Tim Hortons franchise system and under which Plaintiffs would serve as an area developer and franchisees with responsibility for building out the territory from zero to more than 280 stores.

5.      THUSA's financial representations were not only violative of the FTC Franchise Rule and FDUTPA, but also had little to no bearing on the actual Minnesota market and omitted crucial variables, such that Plaintiffs' due diligence, which almost totally relied upon the flawed and fraudulent financial data provided by THUSA, was fundamentally undermined.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the parties and subject matter in this civil action pursuant to 28 U.S.C. § 1332(a) in that the parties are citizens of different states and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

7.      Further, and subject to the agreement(s) at issue in this dispute and the prior, existing Order of the District Court for the District of Minnesota [DE 59], this Court has personal and subject matter jurisdiction over the parties' dispute.

8.       Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in the State of Florida.

## PARTIES

9.      Plaintiff, Tim-Minn, is an incorporated entity organized under the laws of the State of Minnesota, which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040[1], Bloomington, Hennepin County, Minnesota.

10.      Before entering into a business relationship with THUSA to build out and create a market for Tim Hortons in Minnesota, RDP has no prior experience whatsoever in franchising or the restaurant industry on a retail level; it is a real estate developer and general contractors in Canada.

11.      Plaintiff Bemidji is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Bemidji is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

12.      Plaintiff Brainerd is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Brainerd is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

13.      Plaintiff Brooklyn Center is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Brooklyn Center is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

14.      Plaintiff Dinkytown is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices

---

[1]      Previously, Tim-Minn operated from Unit 955 in the same complex before moving to Unit 1040.

located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Dinkytown is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

15.     Plaintiff Cliff Plaza is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Cliff Plaza is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

16.     Plaintiff East Lake is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  East Lake is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

17.     Plaintiff Forest Lake is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Forest Lake is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

18.     Plaintiff International Falls is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  International Falls is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

19.     Plaintiff MOA is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices

5

located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  MOA is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

20.     Plaintiff Maplewood is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Maplewood is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

21.     Plaintiff Savage is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Savage is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

22.     Plaintiff St. Cloud is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  St. Cloud is wholly owned by Tim-Minn Operations, LLC.

23.     Plaintiff Go Wild is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Go Wild is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

24.     Plaintiff Xylon is a single-member limited liability company organized under the laws of the State of Minnesota which, during all relevant times hereto, operated from offices located at 5001 American Boulevard West, Unit 1040, Bloomington, Hennepin County, Minnesota.  Xylon is wholly owned by Tim-Minn Operations, LLC, a non-party to this action.

25.     Plaintiffs Bemidji, Brainerd, Brooklyn Center, Dinkytown, Cliff Plaza, East Lake, Forest Lake, International Falls, MOA, Maplewood, Savage, St. Cloud, Go Wild, and Xylon are hereinafter referred to, collectively, as "the Franchisee Plaintiffs" and any reference thereto shall apply to all such plaintiffs unless otherwise indicated.

26.     Defendant, THUSA, is a Florida for-profit corporation with a principal place of business located at 5707 Blue Lagoon Drive, Miami, Florida 33126. THUSA is the franchisor of the Tim Hortons quick-service franchise restaurant system.

## FACTS GENERALLY APPLICABLE TO ALL COUNTS

### *THUSA's FDD is Governed by the FTC Franchise Rule*

27.     The Federal Trade Commission has promulgated certain laws requiring the delivery to prospective franchisees of a prescribed disclosure document, previously called a UFOC and now a FDD, concerning the franchisor, its management, and the material terms and conditions of the franchise agreement, among other things, prior to the execution of any agreement by a prospective franchisee.  This was known as the Franchise Rule, and the Amended Franchise Rule became effective as of July 1, 2007. The UFOC was, and the FDD is now, a disclosure format accepted by the FTC for conveying such information to prospective franchisees.

28.     The Franchise Rule requires a franchisor to provide prospective franchisees with certain disclosures.  16 C.F.R. 436.2(a).  These representations must be accurate to the best of the franchisor's knowledge and clearly and concisely stated.  Moreover, "it is an unfair and deceptive act" for any franchisor to violate a provision of the Franchise Rule.  *Id*.

29.     The Franchise Rule holds that "it is an unfair and deceptive act or practice...for any franchisor" to "make any claim or representation…that contradicts the information required to be disclosed by [16 C.F.R. 436]." 16 C.F.R. § 436.9; 15 U.S.C. § 57a (d) (3).  Furthermore, FDUTPA,

and the rules promulgated thereunder, provide that violations of the rules promulgated under the Federal Trade Commission Act are violations of Florida law. *See* § 501.203(3), Florida Statutes.

30.     Moreover, under FDUTPA, unfair and deceptive practices by franchisors with respect to the sale of franchises covered by the Act are prohibited. *See, e.g.,* § 501.203(3), Florida Statutes, and the administrative rules promulgated thereunder.

31.      THUSA has violated federal regulations and Florida law insofar as it has engaged in deceptive and unfair practices with respect to the disclosures made in its FDD to Franchisee Plaintiffs, as well as other conduct to be detailed below.

### *The Tim Hortons Brand History*

32.     Tim Hortons is one of Canada's largest quick service restaurant ("QSR"), and over several decades, has made significant inroads into various northern-US markets.

33.     The Tim Hortons brand was developed in 1964 by former NHL player Miles G. "Tim" Horton with the assistance of his partner, Ron Joyce.

34.     Currently, there are over 4,800 "Tim Hortons" cafes in the United States, Canada and worldwide.

35.     In 2014, Tim Hortons merged with Burger King and formed Restaurant Brands International, Limited Partnership ("RBI"), with both franchisors operating under RBI's umbrella.

36.     THUSA is responsible for managing and conducting the Tim Hortons brand's United States-based franchising.

### *The Business Relationship Between Tim-Minn and THUSA*

37.     On July 23, 2015, Mark Holly ("Holly") (a former employee of Tim Hortons) connected Paul Durigon ("Durigon"), Tim-Minn's principal, with Stephen J. Goldstein ("Goldstein"), former Vice President of U.S. Development for THUSA via email.

8

38.     At the time Goldstein and Durigon were introduced, Tim-Minn did not yet exist, and was merely a contemplated entity should talks progress further.

39.     Goldstein and Durigon mutually expressed interest in working together on expanding Tim Hortons in the United States.

40.     Durigon is also part of the ownership of a Canadian construction company which participated in the construction of several Tim Hortons restaurants across Canada and serves as a landlord for a few Canadian Tim Hortons franchisees and was familiar with the brand.

41.     Durigon was not a sophisticated purchaser of either franchises or area development agreements and originally sought a "partnership" with THUSA, as evidenced throughout several of the parties' communications.

42.     On July 27, 2015, Durigon executed a non-disclosure agreement ("NDA") drafted by THUSA.

43.     The following day, Durigon traveled to the Tim Horton's Canadian corporate headquarters in Oakville, Ontario, to meet with Goldstein regarding opportunities in the United States.

44.     On August 3, 2015, and subject to the NDA, Goldstein sent five, identical emails to Durigon, attaching what was represented to be THUSA's then-current FDD (dated May 2015), as well as several, additional documents[2], namely:

    a.   A "pitch book;"

    b.   Renderings of two of the restaurant models;

    c.   A combined master Excel spreadsheet called a "Data Pack;"

    d.   A series of illustrative development maps entitled "Tim Hortons

---

[2] These documents are protected by the parties' NDA.

USA_MinneapolisOpportunity;"

    e.    A rationale behind THUSA's increased pricing; and

    f.    RBI's most recent quarterly presentation (earnings releases).

45.    Notably, in the FDD provided by Goldstein, acting as THUSA's agent, pages 52-68 were blank, and page 51 was blurred so significantly as to be totally unreadable. The affected pages effectively scrubbed the Item 19 disclosures from the FDD.

46.    Conversely, the May 2015 FDD registered with the Minnesota Commerce Department, as required by the Minnesota Franchise Act, Minn. Stat. § 80C.02., is complete and pages 52-68 are intact and present, and page 51 is clear and legible. This document **was not provided to Tim-Minn**.

47.    On September 9, 2015, Durigon and Goldstein spoke via telephone, with Durigon's attorney, Lawrence P. Swistak ("Swistak") on the line, to go over a redlined version of the Area Representative Development Agreement ("ARDA") sent to THUSA.

48.    That same day, Goldstein sent an Excel spreadsheet referenced as a "high level equity investment requirement for capex.[3]"

49.    Goldstein further noted in his email that "we have you building the full schedule for the first year and the majority for the second year. We also put in 1mm[4] of minimum cash in the assumptions to highlight the total equity need without cash flow generation."

50.    On September 21, 2015, Goldstein emailed Durigon a spreadsheet detailing updated quintiles for Tim Hortons Q1 and Q2 2015.

---

[3] Capital Expenditures
[4] $1 million

51.     The following day, September 22, 2015, Durigon attended another meeting with Goldstein at Tim Hortons' Oakville headquarters.  Marketing team members attended this meeting as well in order to present Tim Hortons' marketing strategy at a national level.

52.     On September 27, 2015, Durigon visited the Minnesota market and took detailed notes, which were sent to Goldstein the following day.

53.     On September 27, 2015, Durigon forwarded Swistak's redlines for the revised ARDA to Goldstein.  In the transmitting email, Durigon explained that he (and eventually Tim-Minn) envisioned a business relationship like a partnership with THUSA, and therefore requested the ARDA be altered to reflect that goal.

54.     On September 29, 2015, Durigon forwarded his own redlines to the second ARDA draft, and in the transmitting email expressed again the need for more flexibility to operate because of the acknowledged lack of familiarity (by both THUSA and Durigon) with the Minnesota market. Durigon further highlighted his commitment to the project (as evidenced by $1 million he would raise towards franchise fees) and again addressed the buildout schedule, which was too aggressive and required revision.

55.     In particular, Durigon objected to the covenant – as drafted in the ARDA – that he (and his future company) would invest $15 million into the business but could not distribute profits for the first 8 years of the ARDA.  Durigon justifiably expressed frustration that THUSA's requirement was not conducive to a fair business relationship.

56.     On October 5, 2015, Daniel Edwards ("Edwards"), CFE Director of US Development for Burger King (THUSA's sister company, also owned by RBI) emailed Durigon. Edwards advised that, based on Burger King's experience, construction costs in the Minneapolis

market were 5-8% above the metrics supplied in the data pack the previous month, depending on location and other site conditions.

57.     On October 9, 2015, Goldstein provided an Excel file and supplemental maps detailing numerous potential infill sites in various counties in the Minneapolis region.

58.     Over the next few weeks, the parties continued to negotiate the terms of the ARDA; on October 21, 2015, a meeting was convened at Tim Hortons' headquarters in Oakville to discuss the ARDA.  On October 23, 2015, Durigon received the initial draft of the Exclusivity Agreement. The Exclusivity Agreement, in simplest terms, provided that Durigon had the exclusive right to the Minnesota ARDA through December 18, 2015 in exchange for $50,000.

59.     Goldstein had previously stated THUSA typically did not do exclusivity agreements, which delayed the process. In fact, it was made clear to Durigon that Daniel Schwartz ("Schwartz"), RBI's then-CEO, had to personally approve the deal to move it forward and that RBI's general counsel had a hand in drafting the Exclusivity Agreement.

60.     On October 27, 2015, Durigon returned his comments on the Exclusivity Agreement, noting several provisions were not in line with what had previously agreed upon.

61.     By November 5, 2015, a revised, draft ARDA was circulated electronically by Tim Brinkley, attorney for THUSA.  Durigon, Goldstein, and the attorneys exchanged emails relating to the ARDA and Exclusivity Agreement throughout that week, as well as resetting the deadline in the Exclusivity Agreement back to accommodate for the delay in finalizing it.

62.     On November 8, 2015, Durigon signaled his acceptance of the terms of the Exclusivity Agreement, but noted changes remained necessary in the ARDA.

63.     On November 12, 2015, Durigon and Felipe Athayde ("Athayde"), THUSA's then-Executive Vice President, exchanged emails relating to Durigon's frustration with the slow

progress of completing the Exclusivity Agreement.  Durigon noted he could not bring the deal to his partners for review until it was complete.  Moreover, Durigon advised Athayde – and by extension THUSA – that Deloitte, one of the world's largest professional services corporations, was retained to review the Data Pack and other aspects of the deal in order to assist Durigon (and by extension Tim-Minn) to build and forecast the to-be-created area developer's financial business model, company structure, and development schedules as part of the due diligence process. Athayde reiterated RBI's position that it did not favor exclusivity agreements, and noted several key stakeholders had to sign off on the deal, including RBI's CEO and general counsel.  In response, Durigon suggested pushing back the termination date on the Exclusivity Agreement an additional 60 days to sufficient time to conduct due diligence.

64.     On November 11, 2015, Goldstein sent updated modeling and Data Pack to reflect potential pricing increases for the market and its impact on the P&L.  Durigon shared the updated Data Pack with Deloitte that same day.

65.     Tim-Minn, LLC, was incorporated on November 13, 2015.

66.     On November 17, 2015, revised, near-final drafts of the ARDA and Exclusivity Agreement were circulated.  Durigon again requested an additional 60 days to conduct due diligence.

67.     Goldstein and THUSA were aware Deloitte was assisting Tim-Minn with its due diligence, as evidenced by email communications on November 21, 2015.

68.     By November 27, 2015, Deloitte had returned its initial forecast numbers to Durigon, based on the most recent Data Pack provided by THUSA.  Daniel Wygodny ("Wygodny") of Deloitte's Toronto office met directly with Goldstein to explain the numbers around that time.

69.     On November 30, 2015, Durigon and Goldstein exchanged further emails relating to the terms of the Exclusivity Agreement.  Durigon explicitly states "before we sign the ARDA we need a copy of the Franchise Agreement," to which Goldstein replies (in red text) "OK, however there will be no changes to the ARDA once we sign the exclusivity agreement."

70.     Durigon and Tim-Minn were shocked by Goldstein's representation regarding THUSA's unwillingness to negotiate the terms of the Franchise Agreement because Tim-Minn and its officers had, since the inception of the relationship, reasonably believed they would have an opportunity to negotiate the terms of that documents in the same vein as the ARDA and Exclusivity Agreement.

71.     Despite Durigon's demand and Goldstein's agreement to provide the Franchise Agreement before executing the ARDA, no Franchise Agreement was provided.

72.     On December 9, 2015, the Exclusivity Agreement was fully executed, and it was ultimately extended via amendment to February 22, 2016.

73.     On December 30, 2015, Durigon was provided two, draft registration exemption letters by THUSA through Goldstein; Durigon approved the language on January 3, 2016.  The exemption was ultimately approved by the Minnesota Commerce Department on or about February 19, 2016.

74.     On January 6, 2016, Goldstein told Durigon that the St. Louis Area Developer ("AD") would provide store-level budget figures for his St. Louis locations, but that the P&L for the then-existing restaurants was skewed due to overstaffing because the AD was in the process of opening up new restaurants and was training the staff.  Had the restaurants been at normal staffing levels, it was represented the profits would have been higher for those locations.

75.     Over the next week or so, Goldstein provided additional data to Tim-Minn.  For example, on January 7, 2016, Goldstein sent over the *pro forma* numbers from the St. Louis AD. On January 13, 2016, Goldstein released average annual value ("AUV") information for three Designated Market Areas ("DMA").  The following day, January 14, 2016, Goldstein provided pricing & menu information ("PMIX") data.  This data was keyed to the Detroit, Columbus, and Buffalo markets.  On January 15, 2016, Goldstein provided sales data from a new St. Louis market store which had opened in late June 2015.  The data showed net sales for the location after six months of more than $748,000.  This was encouraging to Durigon and Tim-Minn.

76.     On February 19, 2016, Goldstein requested Tim-Minn produce the required $1 million deposit (contemplated in the ARDA to be used against franchise fees for Tim-Minn's restaurants as they came on line) ahead of schedule, which was contrary to the express terms of the ARDA.

77.     On February 25, 2016, Tim Brinkley ("Brinkley") sent Durigon and Tim-Minn an executed copy of the ARDA and Joinder/First Amendment and confirmed receipt of all wired funds.  With that, all conditions in the agreements were met or waived, and Tim-Minn was ready to close the deal and move forward.

78.     The following day, the ARDA was closed and signed and Goldstein introduced Durigon to THUSA's US area developer support team.

*79.*     Among the terms in the ARDA, Tim-Minn was obligated to open roughly 280 Tim Hortons' restaurants over the lifetime of the agreement on a schedule set forth therein.

### *The Delay in Receiving and Executing the Franchise Agreement*

80.     Between February 25, 2016 and September 6, 2016, no progress was made on obtaining a copy of the Franchise Agreement despite repeated requests.  On that date, Durigon

emailed Goldstein, and others at THUSA, rebuking THUSA for its failure to provide franchise agreements for the restaurants it was on the cusp of opening, and only providing a boilerplate copy of a franchise agreement as part of the ARDA process.

81.     On or about April 7, 2016, Goldstein emailed Holly a copy of a boilerplate franchise agreement and a new, updated FDD (3/2016).

82.     Upon information and belief, the revised FDD was provided to Tim-Minn in a disguised effort to "re-disclose" Tim-Minn and try to avoid the prior failure to produce and provide a "complete" FDD as required by the FTC Franchise Rule and as an attempt to side-step the financial performance representation disclosure rules in Item 19.

83.     On October 17 and 18, 2016, Goldstein and Durigon exchanged emails in which Goldstein attempted to "fast-track" the execution of the Franchise Agreement provided weeks earlier, but Durigon was unable to meet on Goldstein's schedule.  Goldstein advised the unsigned Franchise Agreement was "holding up [THUSA's] process" of publishing the next, updated FDD.

84.     Tim-Minn's attorneys reviewed the proposed Franchise Agreement and in good faith provided recommended changes on October 25, 2016; these redlines were forwarded to Goldstein and Athayde on October 26, 2016.

85.     The following day, October 27, 2016, Durigon and Goldstein exchanged emails in which Goldstein claimed THUSA would not negotiate terms of the Franchise Agreement, while Durigon countered that the Franchise Agreement was provided months after the ARDA and contained numerous provisions in conflict with the terms of the ARDA.  Tim-Minn had, to date, spent millions building out the Minnesota territory and was set to open its first slate of restaurants beginning the following month, yet no Franchise Agreement(s) were executed and, critically,

THUSA had never provided Tim-Minn an Operations Manual or training materials to ensure the restaurants were run according to system specifications.

86.     The parties, through counsel, worked out a compromise position by November 3, 2016, in which THUSA agreed to modify the Franchise Agreement to conform with the ARDA, but would not agree to any further modifications.  Tim-Minn was shocked, having spent more than a year and millions of dollars pushing the project forward, only to be met with unprincipled resistance to reasonable changes at the eleventh hour.

87.     In an email dated November 7, 2016, Durigon – on behalf of Tim-Minn – emailed Goldstein and Athayde expressing Tim-Minn was discouraged by the lack of progress and transparency in negotiating the Franchise Agreement. Durigon's email further notes that THUSA's refusal to negotiate was contrary to the "spirit of the [ARDA] that we negotiated in good faith," and has led to mistrust between Tim-Minn and THUSA.  More, Durigon reminded THUSA that Tim-Minn was never provided an opportunity to negotiate with THUSA on the terms of the Franchise Agreement, which it found unacceptable on a number of levels. Durigon requested THUSA take a reasonable approach and meet with Tim-Minn on some essential terminology modifications to the Franchise Agreement in several, key areas where it is in conflict with the ARDA, including but not limited to: cross-termination, transfer of shares, and matters relating to Tim-Minn's expected, future sale of franchised restaurants to independent franchisees under the ARDA.

88.     Ultimately, by early November 2016 Tim-Minn was ready to begin opening Tim Hortons restaurants in its territory and was making a concerted effort to mend any rifts with THUSA and move forward cooperatively, together.

### *Tim-Minn Builds Out Its Territory*

89.     Tim-Minn, through the individual Franchisee Plaintiffs, opened the following Minnesota locations under the ARDA: (1) Mall of America, Bloomington (Store No. 6648) on November 18, 2016; (2) Dinkytown (No. 6649) on November 28, 2016; (3) Brainerd (No. 6677) on December 21, 2016; (4) International Falls (No. 6662) on February 17, 2017; (5) East Lake, Minneapolis (No. 6676) on March 26, 2017; (6) Brooklyn Park (No. 6651) on May 5, 2017; (7) Savage (No. 7920) on June 19, 2017; (8) Maplewood (No. 7895) on July 30, 2017; (9) Bemidji (No. 7911) on September 4, 2017; (10) St. Cloud (No. 7919) on February 24, 2018; (11) Forest Lake (No. 7893) on April 18, 2018; (12) Treasure Island Center, St. Paul (No. 7929) on May 7, 2018; (13) Brooklyn Center (No. 7924) on August 6, 2018; and (14) Cliff Plaza, Eagan (No. 6652) on November 19, 2018.

90.     Several, but not all, of the Franchisee Plaintiffs individual franchise agreements contained an Exhibit L, the "Tim Hortons USA LLC Compliance Certification" (the "Compliance Certification" or "Exhibit L"). The Compliance Certification stated on its face that THUSA:

> "wants to be sure that the procedures followed by us and our sales representatives in connection with the offer and sale of a franchise to you have been in full compliance with the law."

In each instance where and Exhibit L was provided to a Franchisee Plaintiff as part of its franchise agreement, that Franchisee Plaintiff identified that Tim-Minn had prepaid franchise fees as part of the ARDA, and that the Franchisee Plaintiff had relied upon the Data Pack "which we used to formulate our business plan." Further, the relevant Franchisee Plaintiffs identified THUSA's promise to pay for "costs exceeding 4% in our market."

91.     Eventually, THUSA ceased providing an Exhibit L to new franchise agreements in an attempt to whitewash its prior bad acts as recited more fully above.

92.     Despite Tim-Minn and the Franchisee Plaintiffs' best efforts, all of the foregoing locations were closed in May 2019.

93.     Tim-Minn had also applied for two, additional sites in August 2018 which THUSA denied because THUSA projected them to be low-sales areas: Apple Valley and Lakeville.  Either of these sites would have satisfied the 15th store required under the development schedule set forth under the ARDA.

94.     After opening the 14 Tim Hortons stores listed above, Tim-Minn was unable to continue its scheduled expansion because THUSA took an inordinate amount of time to issue formal disapproval letters for its prospective sites.  Tim-Minn's apparent lack of continued growth was, however, not for lack of trying.  At all times relevant hereto, Tim-Minn maintained weekly contact with its real estate broker regarding potential sites to build new Tim Hortons units.

95.     However, because of THUSA's unreasonable disapproval of new sites, Tim-Minn was unable to enter negotiations with prospective landlords because they did not wish to mislead a potential business associate, which occurred with the Apple Valley and Lakeville sites. Consequently, as of the initial filing of this matter, Tim-Minn had no new locations in its development pipeline due to a confluence of factors including THUSA's refusal to approve the Apple Valley and Lakeville sites predicated on the sales projections for the market based on *actual numbers* established solely due to Tim-Minn's prior and ongoing operations. Notably, the 14 prior site approvals had been based on the incomplete, misleading, and negligently sourced sales data provided to Tim-Minn in the Data Pack produced by Goldstein at the time Durigon was first disclosed in August 2015 because neither Tim-Minn nor THUSA had actual sales numbers from the preceding year against which they could accurately model.

96.     Dustin Tremellen ("Tremellen"), an THUSA employee, confirmed the denial at Lakeville was entirely due to the low sales projection. Tim-Minn requested a second review the Lakeville, but Tremellen did not do so; on a telephone call he verbally advised Tim-Minn "don't bother" trying to push the site because it would not be approved. THUSA's refusal to work with Tim-Minn on sites due to the fault in THUSA's projected financial disclosures – which Tim-Minn relied upon to its detriment – imperiled continued development in the territory.

97.     As these difficulties mounted, THUSA filed a pre-emptive and utterly unnecessary lawsuit which severely and negatively impacted Tim-Minn's relationships with local property owners and has continued to be one of the prime reasons behind Tim-Minn's operational difficulties, including its difficulty opening successive locations.   Indeed, as a result of THUSA's lawsuit, several articles were published in Tim-Minn's market, raising concerns from customers and employees left their positions, as well as the aforementioned challenges with local landlords. In short, and upon information and belief, the lawsuits tarnished the Tim Hortons brand in Minnesota and the blowback was suffered primarily by Tim-Minn and the Franchisee Plaintiffs.

### *THUSA Fails to Perform Under the ARDA*

98.     Among the many terms of the ARDA, THUSA was obligated to provide to Tim-Minn numerous documents, including but not limited to: (1) a copy of the then-current Tim Hortons Franchise System Operations Manual ("Operations Manual"); (2) a copy of the then-current Tim Hortons Franchise System Development Manual ("Development Manual"); and (3) a copy of the then-current Tim Hortons Franchise System Employee Training Manual ("Training Manual").

99.     THUSA did not provide copies of its Operations Manual, Development Manual, or Training Manual to Tim-Minn at any time prior or subsequent to the execution of the ARDA.

100.    As a result, Tim-Minn was forced to develop its own training program and system from scratch.  Tim-Minn did not receive the benefit of its bargain.

101.    In addition, THUSA promoted the Tim Hortons Brand Standards system, which was not designed for, and therefore incompatible with, the entrance into a wholly new market with no brand recognition.  This negatively impacted Tim-Minn's (and its franchised restaurants') day-to-day operations, causing them to lose a substantial amount of money.

102.    Further, under the terms of the Amended ARDA, THUSA was obligated to invest in marketing the Tim Hortons brand to the Minnesota market on behalf of Tim-Minn.  However, THUSA spent carelessly and interfered with the marketing agencies it hired to do the work.  In two, separate instances, agencies dropped the account – after being paid – because THUSA refused to consider local conditions and needs.  Instead THUSA insisted on a marketing strategy not tuned to the Minnesota marketplace.  This cost Tim-Minn roughly $1 million of the $1.5 million budget set forth in the ARDA.  Strikingly, THUSA was unable to document roughly $240,000 spent on local marketing.

103.    More, Tim-Minn came to learn the equipment package (Schedule A to the ARDA) was incomplete, misleading, and in several instances contained inconsistent information.  That is to say, identical equipment was priced differently between Tim Hortons stores and Tim-Minn learned that, in some instances THUSA was selling it old equipment with expired warranties at current market value for new equipment.  In addition, inconsistently applied bogus "discounting," called the "ARDA Discount" with respect to the sale of each unit which, upon information and belief, cause the Franchisee Plaintiffs to suffer economic losses.  The Arda Discount was designed to conceal and offset sales tax for equipment which THUSA failed to account for in its Schedule

A.  The applicable sales tax, plus the $3,000 Ad fee for each Franchisee Plaintiff, zeroed out the ARDA Discount.

104.    In addition, because Schedule A equipment costs were higher in reality than in the Schedule A capex in the Data Pack, Tim-Minn's cash flow was reduced unexpectedly.  These unexpected cash flow reductions were further exacerbated by THUSA and RBI's finance team's wrongful and unauthorized withdrawal from Tim-Minn's accounts.

105.    As but a few examples, RBI, on behalf of THUSA, carelessly withdrew money from incorrect accounts, charged Tim-Minn royalty fees not reflected in the Amended ARDA and charged fees due to other developers in other markets, causing Tim-Minn damages including, but not limited to, diminished cash flow for several restaurants and/or accounts owned by Tim-Minn.

106.    THUSA failed to provide Tim-Minn access to "TimTrac" an online management platform represented by THUSA to be a streamlined portal to connect people from each organization assigned to a given project/market.  TimTrac was represented by THUSA to be an invaluable resource in the development of Tim-Minn's franchise sites and the Minnesota market. However, TimTrac access was withheld for several months, until October 2016 when THUSA eventually provided limited access to the system. Tim-Minn was told there were legal hurdles to providing access, which further delayed deployment of the software.  As a result, Tim-Minn was forced to begin construction and, in some cases complete, restaurants without the use of TimTrac because it had no choice.  Ultimately, the THUSA's lack of organization and ability to follow-through on its own processes delayed each of Tim-Minn's sites and, in particular, the failure to timely process the Schedule A for one location directly delayed its opening.

107.     Finally, RBI employee and officer turnover contributed to a significant number of communication issues which were never satisfactorily resolved in areas from design and construction to operations.

108.     By May 2017, Tim-Minn reached out to THUSA and requested an amended ARDA to accommodate the numerous missteps, failures, and unanticipated difficulties.  It was, at that point, clear to Tim-Minn that it had relied on inaccurate financial representations previously provided by THUSA.  Tim-Minn further realized that, had THUSA provided accurate information in the Data Pack, Tim-Minn would never have executed the ARDA.

### *THUSA Negotiated the Amended ARDA in Bad Faith*

109.     Beginning in May 2017, and continuing for several months, Tim-Minn, THUSA, and RBI negotiated an amended ARDA.

110.     At the time, the Tim Hortons brand standards were not workable for a new market, such as the Minnesota market.

111.     Tim-Minn requested the development schedule be modified in order to recoup its unanticipated losses because the due diligence it had conducted prior to executing the ARDA was based on faulty, misleading, and fraudulently inaccurate financial representations provided by Goldstein on behalf of THUSA.

112.     In addition, the royalty schedule in the ARDA was unworkable due to the real-world economics in the Minnesota market, a reality THUSA had no experience with and failed to prepare Tim-Minn for and for which Tim-Minn could not reasonably be prepared given the financial data provided by Goldstein.

113.     Moreover, in an email sent from Durigon to Goldstein on July 18, 2017, Durigon noted that THUSA's failure to provide adequate marketing materials, training materials, and

operations materials, as well as the foregoing financial missteps and miscues, cost Tim-Minn "millions of dollars getting a footing in the new market and educating THUSA on what needs to be done in order to be successful in Minnesota, because you acknowledged your mistakes…"

114.    Between July and October 2017, numerous emails were exchanged by Tim-Minn and Goldstein, and the amended ARDA took shape.

115.    There were numerous issues to be negotiated, not the least of which THUSA's insistence on paying out the existing Schedule A in full, but (and as noted above) the invoicing was inconsistent and Tim-Minn began to understand THUSA was acting in bad faith and taking advantage of its relative inexperience with the system.

116.    These inefficiencies and errors led to construction delays which caused Tim-Minn to expend additional capital re-mobilizing general contractors on construction projects and, in some case, pay delay damages to contractors.

117.    For example, Cliff Plaza was delayed weeks because Tremellen and RBI failed to initiate the process of putting a Schedule A package together for that location – a 6-10-week turnaround.  The project general contractor could not commence construction and Tim-Minn was stuck paying rent on an unusable site, which in turn meant the restaurant opened at a loss.  Tim-Minn's Brooklyn Center location suffered similar delays and costs; other locations suffered from similar delays and cost overruns.

118.    On December 4, 2017, Goldstein emailed Durigon and demanded the Amended ARDA be executed "by end of today."  THUSA made clear that, if Tim-Minn did not execute the Amended ARDA that day, it would revoke its offer to amend the ARDA and Tim-Minn would have been in default of its development obligations and Tim-Minn risked the imminent loss of its entire investment.

119.     The following day, Durigon emailed Goldstein to advise the Amended ARDA would be signed by Tim Minn and an executed copy was forwarded to Goldstein at 5:48 PM.

120.     On December 5, 2017[5], the Amendment to Area Representative and Development Agreement ("Amended ARDA") was executed by Durigon on behalf of Tim-Minn.  Notably, Tim-Minn's obligation to open Tim Hortons restaurants was reduced to roughly 190 units over the lifetime of the ARDA, which was still an overwhelming target based on THUSA's failure to properly market the territory and invest in public awareness of the Tim Hortons brand.  A true and correct copy of the Amended ARDA is annexed hereto as Exhibit A.

121.     The Amended ARDA modifies and replaces language relating to, among other things, royalties, development schedules, and other issues which had plagued the original ARDA.

122.     In addition to the foregoing, the Amended ARDA includes a "General Release" **which does not specifically restrict fraud claims or FDUTPA violations as required under Florida law to release same**.  The General Release states, in pertinent part:

> 11.    GENERAL RELEASE. For and in consideration of THUSA entering into this Agreement, and other good and valuable consideration received from or on behalf of THUSA, the receipt of which is hereby acknowledged, Developer, for itself and on behalf of itself of each Affiliate, hereby remises, releases, acquits, satisfies, and forever discharges THUSA, its officers, directors, agents, employees, affiliates, subsidiaries, parent corporation, and all of their assignees (individually and together "THUSA"), of and from all manner of claims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, and executions whatsoever, in law or in equity, which Developer or any Affiliate ever had, now has, or which any successor or assign of Developer or any Affiliate hereafter can, shall, or may have, whether known or unknown, against THUSA for, upon, or by reason of any matter, cause, or thing whatsoever, from the beginning of the world to the date of this Agreement.

123.     The same day, on December 5, 2017, THUSA initiated a lawsuit in the District Court for the Southern District of Florida, bearing Case No. 1:17-cv-24395-FAM, against *seven* of Tim-Minn's wholly-owned LLCs for alleged violations of the ARDA.

---

[5] The Amended ARDA is dated December 1, 2017, but it was not signed until December 5, 2017.

124.     Goldstein and THUSA had bargained in bad faith to obtain a signature on the Amended ARDA and, despite receiving what they demanded, they filed a lawsuit regardless.

125.     Outrageously, the lawsuit held the St. Cloud and Forrest Lake restaurants in limbo: despite the fact that both locations were fully constructed, they sat empty and bereft of equipment for roughly four months, during which time Tim-Minn was forced to pay its General Contractor for its work, as well as rent for the locations, and labor costs for a trained, ready workforce with nowhere to actually work.  This, alone, significantly diminished available cash flow for Tim-Minn.

126.     The suit was withdrawn without prejudice pursuant to *Fed. R. Civ. P*. 41(a)(1)(A)(i) on December 11, 2017, but only after THUSA held Tim-Minn ransom on a Schedule A payment, which was taken from Tim-Minn's $1,000,000 franchise fee prepayment, and an Order of Dismissal was issued on December 27, 2017.

127.     The lawsuit had far-reached effects, including but not limited to repeated and continuous fall out with Minnesota property owners, the general public and Tim-Minn employees who were aware of the litigation and became leery of getting into working with Tim-Minn and its efforts to further develop the Minnesota market  thereafter.  As but one example, Tim-Minn's real estate broker, Colliers International, caught wind of the suit when a local news organization, the Star Tribune, published an article online and in print about it.  Colliers reported at least one landlord had called with questions about the article, and others were expected.

128.     Holly forwarded the Colliers email to Goldstein, expressing concern about the negative feedback from the suit and article and identifying the impact to Tim-Minn's business. Goldstein admitted the suit was "a major f--- up."

### ***THUSA's Improper Pricing Model***

129.     In addition to the foregoing malfeasance, THUSA has violated the terms of its FDD

and, among others, each of the Franchisee Plaintiffs' Franchise Agreements by selling products to each of the Franchisee Plaintiffs at unreasonable markups.

130.    THUSA is Tim Hortons' US-based franchisor.

131.    Specifically, at Item 8 of the May 2015 FDD on which Tim-Minn was disclosed, as well as Item 8 of the FDDs produced by THUSA in 2016, 2017, and 2018, on which the Franchisee Plaintiffs were, or could have been disclosed, Tim Hortons (and by extension, THUSA) states:

> …you must purchase or lease all products, fixtures, furnishings, building components, equipment, décor, signs, paper goods, containers, cartons, packaging, supplies, and smallwares and other utensils, services, including project management services, product ingredients, insurance and other items installed in used, or sold by the Shop ("**Items**") solely from suppliers who have been approved by us and all these Items must meet our specifications.  We can designate ourselves, our affiliates, or a third party as the sole supplier for any Item. … We and our affiliates may charge what we consider to be a ***reasonable mark-up*** (*emphasis added*) on items sold to you. [6]

132.    The FDDs further note that Tim Hortons "estimate[s] that the purchase from approved suppliers will represent approximately 100% of your total purchases…"

133.    According to the FDDs and upon information and belief, THUSA purchases numerous items from approved suppliers, then sells it to a wholly owned entity, The TDL Group Corp. ("TDL").   TDL is the franchisor for Tim Hortons Canadian businesses and has approximately 3,700 Tim Horton "Shops" franchised in that country.

134.    TDL, in turn, sells these supplies and goods to a distributor, which, in turn, sells the items to franchisees and franchisee guarantors like Tim-Minn.  TDL also sells Canadian equipment to U.S. companies/distributors without adequate details on exchange rates and CAD and/or US taxes.

---

[6]    The corresponding paragraphs in the 2016, 2017, and 2018 FDDs are substantially identical and contain the same promise of a "reasonable mark-up."

135.     TDL and THUSA acknowledge they "will derive revenue from sales of Selected Goods and Articles to" the distributors, who, in turn, profit on the sale to Franchisee Plaintiffs.

136.     Notwithstanding the foregoing, THUSA represented to Tim-Minn and Bemidji that any charges it and its affiliates make would be "reasonable."  However, in practice, those charges are not "reasonable" by any metric – and this is by design.

137.     The Franchisee Plaintiffs, which operated as single-member LLCs owned by Tim-Minn Operations, LLC, itself an entity owned by Tim-Minn, was required to operate its Tim Hortons franchised shop pursuant to the policies and procedures established by Defendant for the operation of a Tim Hortons franchise shop.

138.     For example, § 5.07 of the Bemidji franchise agreement (which is substantially similar to the other franchise agreements executed by the other Franchisee Plaintiffs[7]) required to purchase inventory, supplies and equipment from the vendors specified by Defendant to operate their Tim Hortons shops.

139.     THUSA abandoned the specific representations in the May 2015 FDD and subsequent FDDs which were or could have been provided to Tim-Minn and the Franchisee Plaintiffs that only "reasonable" profits would be made on required purchases of products and services from either Tim Hortons directly or its approved suppliers.[8]  In fact, the prices paid by Franchisee Plaintiffs for supplies from THUSA directly or from an "approved supplier" were grossly increased, permitting THUSA to wrongfully obtain additional income.

---

[7]     Some franchise agreements, such as the Brooklyn Centre franchise agreement, list this covenant in § 5.06. Brainerd, Dinkytown, Cliff Plaza, East Lake, Forest Lake, International Falls, MOA, Savage, St. Cloud, Go Wild, Xylon franchise agreements have a substantially similar (if not identical) § 5.07.

[8]     Item 8 "Restrictions On Sources of Products and Services",: "We and our affiliates may charge only what we consider to be a reasonable mark-up on items sold to you."

140.     While THUSA represented it will take a "reasonable" profit on the sale of certain items, it has failed to limit itself to "reasonable" profits on numerous products and supplies.

141.     For example, and upon information and belief THUSA charged the Franchisee Plaintiff in excess of $104.08 per case *more* for Applewood bacon than Wendy's franchisees will pay for the identical product. Tim Hortons' franchisees also pay $23.85 *more* for boxes of diet and regular Coke; $10.92 *more* for a case of medium, large, or extra-large vinyl gloves; $11.92 *more* for a case of 9-inch plastic straws; and $9.53 *more* for a 50 count of register thermo tape than do Wendy's franchisees. Other examples include charging double for credit card processing fees.

142.     THUSA's scheme to profit off of the Franchisee Plaintiffs is an unconscionable business practice insofar as it is disguised and intentionally not properly disclosed to Tim-Minn, in violation of FDUPTA and Florida law.

143.     The Franchisee Plaintiffs reasonably relied upon the representations in the 2015 and subsequent FDDs when they entered into their franchise agreements, justifiably believing that the disclosure provided by THUSA – that markups would be "reasonable" meant that there was an objective standard of reasonableness.

144.     At the time of disclosure and until well after the various franchise agreements at issue here were executed, the Franchisee Plaintiffs did not know, and could not have known, that the Item 8 disclosure was misleading or subject to a tortured interpretation of "reasonable" such that THUSA believed that "reasonable" was to be defined in its sole discretion.  Certainly, there is no such language in Item 8 of any FDD provided to the Plaintiffs, or which could have been provided to the Plaintiffs at any relevant time.

145.     There was no reason apparent to the Franchisee Plaintiffs prior to executing the various franchise agreements that THUSA's Item 8 disclosure indicating markups would be "reasonable" was anything other than a statement to be taken at face value.

146.     The Franchisee Plaintiffs would not have entered into franchise agreements with THUSA, had the true nature of these so-called "reasonable" mark-ups been made apparent or was even discoverable by them prior to executing their respective franchise agreements.

147.     THUSA exploited the fact that there exists a substantial imbalance of power between it and Tim-Minn and the Franchisee Plaintiffs.  THUSA used this imbalance to implement its business scheme.

### THUSA Breaches the Franchise Agreements by Improperly Charging the Franchisee Plaintiffs

148.     Per the Amended ARDA, the Franchisee Plaintiffs open and operating between June 1, 2017 and December 31, 2018 were to be charged royalties of 0.1% for the first 12 months of operation and 3% thereafter.  *See* Exhibit A.

149.     However, and in violation of this express provision, Durigon, on behalf of the Franchisee Plaintiffs, discovered that THUSA was improperly billing the Brooklyn Park store at 3% of gross sales as royalty payment prior to December 31, 2018 when it should have billed 0.1% of gross sales.

150.     When this discrepancy was discovered, Tim-Minn, on behalf of Brooklyn Park, emailed Dustin Tremellen on April 1, 2019, objected to the practice, and demanded the billing be corrected and all funds taken improperly be credited back to Brooklyn Park's account.

151.     Tremellen responded on April 22, 2019 that the matter was reviewed and resolved, with an appropriate credit to be supplied.

152.    However, when Tim-Minn reviewed subsequent invoices, they discovered that THUSA had improperly and without reason or basis, artificially increased Brooklyn Park's gross sales during the relevant time period. In so doing, THUSA was unjustly enriched.

153.    Upon information and belief, THUSA has engaged in similar improper accounting and billing practices affecting the other Franchisee Plaintiffs.

**COUNT I**
**VIOLATION OF THE MINNESOTA FRANCHISE ACT,**
**Minn. Stat. § 80C.01 *et seq.***
**(Franchisee Plaintiffs vs. THUSA)**

154.    Franchisee Plaintiffs repeat and reallege Paragraphs 1 through 151 as if set forth fully herein.

155.    Minnesota has passed strong, remedial legislation intended and designed to protect Minnesota franchisees from unfair contracts and abuses by franchisors: the Minnesota Franchise Act ("MFA")

156.    The Franchisee Plaintiffs are each a "franchisee," as that term is defined under the MFA. *See* Minn. Stat. § 80C.01(sub. 5).

157.    THUSA is a franchisor as that term is defined under the MFA. *See* Minn. Stat. § 80C.01 (sub. 6).

158.    The MFA requires franchisors who sell franchises in Minnesota register their "offering circular" with the Commerce Department, and any franchisee sold a franchise in Minnesota must be provided a copy of the registered, state-approved offering circular. *See* Minn. Stat. §§ 80C.02, 80C.05, 80C.06.

159.    Each application for registration must contain a full "public offering statement" which meets the requirements of the MFA. *See* Minn. Stat. § 80C.04.

160.    A properly formulated FDD (as required under the FTC Franchise Rule) meets the

requirements of § 80C.04, with some state-specific additional disclosures.

161.    Minnesota does not require franchisors to include financial representations in their offering circulars.

162.    However, it is a prohibited practice under the MFA for any person to sell or offer for sale a franchise by means of any untrue statement of material fact or omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  *See* Minn. Stat. § 80C.13 Sub. 2.

163.    At all times relevant hereto, THUSA had a validly registered offering circular (or FDD) on file with the Commerce Department.  At the time Tim-Minn became interested in a Minnesota area development agreement, the active and most current offering circular was THUSA's May 2015 FDD.  At the time the Franchisee Plaintiffs executed their franchise agreements, THUSA had consistently updated its offering circular with the Commerce Department.

164.    Each of the FDDs referred to elsewhere herein, at Item 8, represent, *inter alia*, that THUSA will charge a "reasonable" markup of goods it requires franchisees – like the Franchisee Plaintiffs – to purchase from either THUSA directly, or one of its approved vendors.

165.    The Franchisee Plaintiffs, as set forth elsewhere herein, reasonably relied upon the representations found in Item 8 of THUSA's FDD that markups on necessary purchases would be reasonable.

166.    In practice, however, the markups on items and goods sold to Tim-Minn's franchisee subsidiaries, the Franchisee Plaintiffs, were objectively unreasonable: in some cases, Tim-Minn was charged, upon information and belief, between 20-50% above market rate for necessary items it was contractually prohibited from purchasing through another source.

167.    The Franchisee Plaintiffs could not have known THUSA's FDD contained misleading information at the time it was provided.

168.    Given the fact that THUSA's markups on items the Franchisee Plaintiffs needed to purchase from it, or its approved suppliers, were unreasonable, THUSA's FDDs contain an untrue – or at minimum exceptionally misleading – statement of material fact in violation of Minn. Stat. §80C.13 Subd. 2.

169.    Moreover, such misleading and objectively untrue statements represent an unfair and inequitable practice under Minn. Stat. §80C.14 Subd. 1 and 2, as well as *Minn. Admin. Rule* 2860.4400 (G).

170.    The Franchisee Plaintiffs have been damaged by these material misrepresentations and false statements insofar as it has been forced to spend thousands of dollars over market to line THUSA's coffers in an amount to be established at trial.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
### (Franchisee Plaintiffs vs. THUSA)

171.    Franchisee Plaintiffs repeat and reallege Paragraphs 1 through 151 as if set forth fully herein.

172.    The ARDA between THUSA and Tim-Minn gives rise to express obligations and also gives rise to a mutual implied covenant of good faith and fair dealing between the parties.

173.    The franchise agreements between the Franchisee Plaintiffs, individually, and THUSA give rise to express obligations and also give rise to a mutual implied covenant of good faith and fair dealing between the parties.

174.    Under these covenants, each party has an obligation and duty to act fairly towards the other, to do nothing destructive of the other party's right to enjoy the fruits of the contract, and

to do everything that the contract presupposes they will do to accomplish its purpose.

175.    The obligations of THUSA to abide by these implied covenants of good faith and fair dealing is heightened by the substantial imbalance of power between THUSA and Tim-Minn and THUSA and each, individual Franchisee Plaintiff.

176.    THUSA failed to act in good faith and deal fairly with Tim-Minn because it provided incomplete, incorrect, and misleading financial information to Tim-Minn, and in so doing it sought to insulate itself from liability by appending invalid disclaimers to those financial representations in violation of the express representations in its FDD, which are incorporated into the terms of the ARDA and Amended ARDA.

177.    THUSA's financial representations carry with them language which appear to be SEC Safe Harbor disclaimers: however, Tim-Minn is and was not an investor and the SEC disclaimers do not eliminate or excuse THUSA's obligation to disclose financial data fully, fairly, and completely once it had chosen to do so.

178.    THUSA failed to act in good faith and deal fairly with the Franchisee Plaintiffs because, among other things, it materially mislead the Franchisee Plaintiffs with promises of "reasonable" markups on necessary purchase and provided inconstant and bogus "discounts" to the Franchisee Plaintiffs in order to mask taxes and other fees.  As set forth in more detail above, these representations are contained in the FDDs the Franchisee Plaintiffs were, or should have been, disclosed within 2015-2018 at Item 8.

179.    Relatedly, THUSA failed to deal fairly with the Franchisee Plaintiffs by and through its inconsistent, bogus "discounting" which was, in reality, designed purely to mask required sales taxes and represented a significant percentage of the overcharging for necessary equipment sold to the Franchisee Plaintiffs.

180.     More specifically, for each franchise sold to each, respective Franchisee Plaintiff, the Franchisee Plaintiff was required to outfit its entire franchised restaurant with necessary furniture, fixtures, and equipment ("FF&E").   THUSA mandated specific FF&E, which was facilitated through Tim-Minn as set forth in Schedule A to the ARDA (and Amended ARDA).[9]

181.     However, the Franchisee Plaintiffs learned (as did Tim-Minn) that Schedule As for each restaurant were often incomplete, misleading, and in several instances contained inconsistent information.  That is to say, identical equipment was priced differently between Tim Hortons shops and Tim-Minn learned THUSA was selling it used old equipment at new current market value equipment prices.  In addition, THUSA was obligated to discount the scheduled prices for the first, two restaurants in Tim-Minn's territory, but those discounts were not applied properly by THUSA, if at all.

182.     Tim-Minn reasonably and justifiably relied upon THUSA's disclosures to its detriment, spending millions of dollars on an area development deal it never would have entered had it been provided an accurate picture of the financial needs of the territory.

183.     The Franchisee Parties reasonably and justifiable relied upon THUSA's representations to their detriment, spending tens of thousands of dollars (if not more) purchasing their respective franchises and the necessary equipment for each.

184.     As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

## COUNT III
### FRAUD
### (Tim-Minn vs. THUSA)

185.     Tim-Minn repeats and reallege Paragraphs 1 through 151 as if set forth fully herein.

---

[9]          *See, e.g.,* Amended ARDA § 7.

186.    As stated elsewhere herein, THUSA provided false and misleading financial information to Tim-Minn in connection with its effort to sell an area development agreement (the ARDA) to Tim-Minn.

187.    THUSA's false, misleading, and incomplete financial disclosures were known by THUSA to be false, misleading, and/or incomplete at the time they were disclosed to Tim-Minn. As evidence hereof, THUSA knowingly appended invalid SEC Safe Harbor disclaimers to its disclosures in a naked attempt to insulate itself from liability.

188.    THUSA took advantage of Tim-Minn and Durigon, knowing they lacked sophistication and experience in the quick service restaurant industry and the Minnesota market.

189.    Tim-Minn reasonably and justifiably relied upon the representations of its franchisor to its detriment.

190.    As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(Tim-Minn vs. THUSA)**

191.    Tim-Minn repeats and realleges Paragraphs 1 through 151 as if set forth fully herein.

192.    THUSA owed Tim-Minn a duty of care, specifically a duty to provide accurate and complete financial data as required by the MFA and common law of Minnesota, as well as the common law of Florida.

193.    THUSA supplied financial data to Tim-Minn for Tim-Minn to use as guidance and modeling as part of the parties' business transactions.

194.    Tim-Minn was justified in its reliance upon the THUSA-supplied financial data.

195.     The THUSA-supplied data was false and misleading.

196.     THUSA failed to exercise reasonable care and/or competence in collecting and disseminating the financial performance data it supplied to Tim-Minn.

197.     As a result of the foregoing, Tim-Minn has been damaged in an amount to be established at trial.

## COUNT V
## BREACH OF CONTRACT
### (Franchisee Plaintiffs v. THUSA)

198.     Franchisee Plaintiffs repeat and reallege Paragraphs 1 through 151 as if set forth fully herein.

199.     The Franchise Plaintiffs' franchise agreements are valid, binding contracts between each Franchisee Plaintiff and THUSA.

200.     The operating FDDs at the times each of the Franchisee Plaintiffs was disclosed, which is incorporated into the Bemidji's franchise agreement, contained specific promises in, among other places, Item 8.

201.     In that Item 8, THUSA promised to charge only a "reasonable" mark-up on necessary items purchased through it and its subsidiaries for Bemidji's business operations.

202.     THUSA breached the franchise agreement with the Franchisee Plaintiffs by, among other things, breaching the express contractual representation in the FDD that it would only charge "reasonable" mark-ups on products and supplies required to bed purchased from Tim Hortons or its designated affiliate.

203.     Defendant's express breaches of the Franchisee Plaintiffs' franchise agreements are a substantial factor in causing the Franchisee Plaintiffs' damages.

204.    As a result of the foregoing, the Franchisee Plaintiffs is entitled to damages to be established at trial.

## COUNT VI
## UNJUST ENRICHMENT
### (Franchisee Plaintiffs vs. THUSA)

205.    Franchisee Plaintiffs repeat and reallege Paragraphs 1 through 151 as if set forth fully herein.

206.    Defendant has, by virtue of the franchise agreement signed by the Franchisee Plaintiffs, received thousands of dollars in payments from the unreasonable mark-ups imposed on goods and services required by THUSA for use in its shop.

207.    In addition, Defendant has inconsistently imposed bogus discounts related to the Franchisee Plaintiffs' purchase of their respective franchise outlets, with respect to the calculation and imposition of sales tax and marketing fees, which affected the net amount owed by each Franchisee Plaintiff.

208.    THUSA engaged in these practices to mask unreasonable markups on necessary equipment the Franchisee Plaintiffs were required to purchase from THUSA or one of its subsidiaries and/or approved vendors.

209.    The money received by THUSA from these mark-ups and bogus discounts was unconscionably obtained because Defendant unreasonably aggregates through middlemen which causes additional costs to be passed down the chain to the Franchisee Plaintiffs and, with respect to the bogus discount scheme, Defendant unreasonably and improperly calculated fees due and owing to it in order to obtain additional compensation it was not entitled to.

210.    Defendant has, therefore, received from the Franchisee Plaintiffs an income benefit through inflated mark-ups and bogus discounting which was intended to hide the true cost of the franchise from the Franchisee Plaintiffs.

211.    THUSA has a pecuniary interest in milking as much money from the Franchisee Plaintiffs as possible via these unreasonable mark-ups and effectively holds it hostage to these exorbitant fees because it is bound, by the franchise agreements to purchase necessary items solely from Defendant.

212.    THUSA has additional leverage: the Franchisee Plaintiffs cannot choose outside suppliers for these necessary items because to do so would violate their respective franchise agreements and could have resulted in termination of their franchises.

213.    THUSA has a pecuniary interest in hiding the true cost of its franchises from the Franchisee Plaintiffs because, by doing so, it was able to secure additional funds via unreasonable equipment markups.

214.    Effectively, Defendant has the Franchisee Plaintiffs captive and knowing this is so, gouged them to an unreasonable and prohibitively expensive degree.

215.    By virtue of these actions, the Franchisee Plaintiffs have been damaged in an amount to be established at trial.

### COUNT VII
### BREACH OF CONTRACT
### (All Plaintiffs v. THUSA)

216.    Plaintiffs repeat and reallege Paragraphs 1 through 151 as if set forth fully herein.

217.    The Amended ARDA, is a valid, binding contract between Tim-Minn and THUSA.

218.    The Franchisee Plaintiffs' franchise agreements were valid, binding contracts between each Franchisee Plaintiff and THUSA.

219.    Under the terms of these agreements, THUSA, was obligated to perform certain obligations, including but not limited to providing training and operational support and manuals to Tim-Minn and the Franchisee Plaintiffs, providing access to proprietary computer systems such as TimTrac, and to ensure Tim-Minn and the Franchisee Plaintiffs had what they needed to meet their obligations under the terms of the ARDA and/or Amended ARDA, as well as the various franchise agreement.

220.    These promises were made expressly or by implication in the ARDA (and the Amended ARDA) in § 7, generally, as well as in the individual franchise agreements executed by the Franchisee Parties § 3.01[10].

221.    THUSA failed to perform their numerous obligations under the terms of the various agreements in effect between the parties.

222.    This failure to perform made it impossible for Tim-Minn and the Franchisee Plaintiffs to perform their own obligations due to the fact that Tim-Minn and the Franchisee Plaintiffs' performance was often contingent upon THUSA's performance, which was constantly delayed or wholly defaulted.

223.    As a direct and proximate result of THUSA's breach of the various contracts, Tim-Minn and the Franchisee Plaintiffs have been damaged in an amount to be established at trial.

**COUNT VIII**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**
**(Tim-Minn v. THUSA)**

224.    Plaintiff Tim-Minn repeats and realleges Paragraphs 1 through 151 as if set forth fully herein.

225.    The Amended ARDA between THUSA and Tim-Minn gives rise to a mutual

---

[10]    All franchise agreements share this language at § 3.01.

implied covenant of good faith and fair dealing between the parties.

226.    Under this covenant, THUSA had an obligation and duty to act fairly towards Tim-Minn, to do nothing destructive of the Tim-Minn's right to enjoy the fruits of the contract, and to do everything that the contract presupposes they will do to accomplish its purpose.

227.    The obligations of THUSA to abide by the implied covenant of good faith and fair dealing is heightened by the substantial imbalance of power between THUSA and Tim-Minn.

228.    THUSA failed to act in good faith and deal fairly with Tim-Minn because THUSA intentionally and/or negligently undermined Tim-Minn's ability to meet its development schedule by filing an unnecessary, preemptive lawsuit in the Southern District of Florida which, as a public record, was the subject of published journalism and much comment in the Minnesota market where Tim-Minn conducts its business.

229.    This unnecessary and wasteful lawsuit – dismissed less than a week after it was filed in admitted error – caused and continues to cause unnecessary and expensive delays in Tim-Minn's development schedule because local property owners are unwilling to deal with Tim-Minn on terms which are fiscally responsible for Tim-Minn, whereas prior to the suit Tim-Minn was able to stay within budgetary parameters more easily and find workable compromises with local real estate ownership.

230.    The Amended ARDA contains a strict development schedule which Tim-Minn was required to meet to maintain its territory.  Tim-Minn was prevented from meeting the development schedule in large part because landlords were not interested in working with them after the suits were filed by THUSA.  *See* Amended ARDA, Ex. B, C.

231.    As a direct and proximate result of THUSA's breach of the various contracts, Tim-Minn has been damaged in an amount to be established at trial.

<u>COUNT IX</u>
**VIOLATION OF THE FLORIDA DECEPTIVE & UNFAIR**
**TRADE PRACTICES ACT, § 501.201, *et seq*.**
**(Franchisee Plaintiffs vs. THUSA)**

232.    Franchisee Plaintiffs repeat and reallege Paragraphs 1 through 151 as if set forth fully herein.

233.    At all times relevant hereto, the Franchisee Plaintiffs are "consumers" as that term is defined under FDUTPA, § 501.203(7).

234.    Section 501.201(3), Florida Statutes, provides that violations of the rules promulgated under the Federal Trade Commission Act ("FTCA") are violations of FDUTPA.

235.    The Amended Franchise Rule, 16 C.F.R. § 436 is authorized under the FTCA and violations of the Amended Franchise Rule are deemed to be violations of the FTCA. *See* § 16 C.F.R. § 436.9(a).

236.    THUSA is a "franchisor" as defined in  the Amended FTC Franchise Rule, 16 C.F.R. § 436.1(k).

237.    FDUTPA is applicable as the fraudulent conduct alleged herein occurred in whole or in part within the State of Florida.  However, to the extent some events occurred in Minnesota or elsewhere, FDUTPA has no geographical or residential restrictions.

238.    In the conduct of trade or commerce, Defendant did engage in unconscionable acts or practices and unfair or deceptive acts or practices in violation of FDUTPA, as described more fully above.

239.    More specifically, THUSA provided false and misleading financial information outside of the confines of its 2015 FDD to Tim-Minn prior to Tim-Minn's execution of the original ARDA, as described at length in the preceding paragraphs.  (*See* ¶¶ 44, 50, 64, 75).

240.    The provision of financial information outside of the Item 19 disclosure in the FDD

is expressly prohibited by the Amended Franchise Rule. *See* 16 C.F.R. § 436.9(c). The Item 19 provided to Tim-Minn was essentially a series of blank pages without appropriate disclaimers as required by the Amended Franchise Rule.

241. However, as noted in the preceding paragraphs in greater detail, THUSA (though Goldstein) provided numerous financial representations which were not contained in the Item 19 on file with the Minnesota Department of Commerce and which were, ultimately, inflated and/or misleading.

242. THUSA did not disclose that its financial representations were inflated and/or misleading. Nor did THUSA advise that it was violating FTC regulations by providing the Data Pack and other financial data to Tim-Minn before the ARDA was signed.

243. THUSA intended Tim-Minn rely on financial representations provided outside the bounds of Item 19 of the FDD.

244. Tim-Minn did, in fact, rely on those representations and caused Deloitte, who performed due diligence on their investment utilizing that financial data, to also rely upon same.

245. Tim-Minn entered into the ARDA based on false, misleading, and unlawful financial representations provided by THUSA and its agents in violation of the FTCA and the Amended Franchise Rule.

246. Pursuant to § 501.203 of the Florida Statutes, a violation of the FDUTPA may be based upon: (a) any rules promulgated pursuant to the Federal Trade Commission Act; (b) standards of unfairness and deception set forth and interpreted by the Federal Trade Commission (the "FTC") or the federal courts; or (c) any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

247. As described more fully above, Defendant failed to comply with the Trade

Regulation Rules promulgated by the FTC relating to "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," set forth at 16 C.F.R. 436.

248.    The relationship between Defendant and the Franchisee Plaintiffs was a "continuing commercial relationship," as evidenced by the individual franchise agreements executed by the parties.

249.    As a direct and proximate result of Defendant's failure to comply with the Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," set forth at 16 C.F.R. § 436.9, Plaintiff has suffered severe and significant financial losses in the millions of dollars.

## COUNT X
## BREACH OF CONTRACT
### (Tim-Minn and Franchisee Plaintiffs v. THUSA)

250.    Plaintiffs repeat and reallege Paragraphs 1 through 148 as if set forth fully herein.

251.    The Amended ARDA is a valid, binding contract between Tim-Minn and THUSA.

252.    The Franchisee Plaintiffs were intended beneficiaries of certain provisions of the Amended ARDA.

253.    Among those provisions, the Amended ARDA contained an express provision whereby franchises owned by Tim-Minn would be assessed a reduced royalty of 0.1% of gross sales for the period between June 1, 2017 and December 31, 2018, and thereafter 3% of gross sales for the next 12 months.

254.    More specifically, § 5 of the Amended ARDA states (in pertinent part) as follows:

"(a) Royalties.

(1) During the term of the Franchise Agreement for each Direct-Owned TH Restaurant, Developer will pay a weekly royalty fee to THUSA as follows:

(i) during the period commencing on June 1, 2017 through December 31, 2018, one-tenth of one percent (0.1%) of weekly Gross Sales (as defined in the applicable Franchise Agreement) of the Direct-Owned TH Restaurant;

(ii) during the period commencing on January 1, 2019 through the end of Development Year 6 (i.e., June 30, 2022), three percent (3%) of weekly Gross Sales(as defined in the applicable Franchise Agreement) of the Direct-Owned TH Restaurant;

(iii) notwithstanding the royalty fees set forth in Sections 8.10(a)(1)(i) and 8.10(a)(1)(ii) of this Amendment, for any new Direct-Owned TH Restaurant opened by Developer during the period between January 1, 2018 and December 31, 2018, Developer shall pay a reduced weekly royalty fee of one tenth of one percent (0.10%) of weekly Gross Sales for the initial 12 months of the term of the relevant Franchise Agreement and upon expiration of such 12-month period, the weekly royalty fee shall increase to three percent (3%) of weekly Gross Sales as forth in Section 8.10(a)(1)(ii) above and shall thereafter increase through the remaining term of the applicable Franchise Agreement as provided below in this Section 8.10(a)(1);

255.   However, THUSA did not properly charge the Franchisee Plaintiffs, such as Brooklyn Park, an appropriate percentage of gross sales during the period prior to December 31, 2017.

256.   When THUSA was advised it was in breach of the express terms of the Amended ARDA, THUSA failed to correct its improper billing and, instead, engaged in further deceptive billing practices in order to obtain an unearned financial advantage at the Plaintiffs' expense.

257.   As a direct and proximate result of THUSA's machinations, the Plaintiffs have suffered severe and significant financial losses.

## COUNT XI
## UNJUST ENRICHMENT
### (Franchisee Plaintiffs v. THUSA)

258.   Franchisee Plaintiffs repeat and reallege Paragraphs 1 through 148 as if set forth fully herein.

259.   The Amended ARDA is a valid, binding contract between Tim-Minn and THUSA.

260.     The Franchisee Plaintiffs were intended beneficiaries of certain provisions of the Amended ARDA.

261.     Among those provisions, the Amended ARDA contained an express provision whereby franchises owned by Tim-Minn would be assessed a reduced royalty of 0.1% of gross sales for the period between June 1, 2017 and December 31, 2018, and thereafter 3% of gross sales for the next 12 months.

262.     However, THUSA did not properly charge the Franchisee Plaintiffs, such as Brooklyn Park, an appropriate percentage of gross sales during the period prior to December 31, 2017.

263.     When THUSA was advised it was in breach of the express terms of the Amended ARDA, THUSA failed to correct its improper billing and, instead, engaged in further deceptive billing practices in order to obtain an unearned financial advantage at the Plaintiffs' expense.

264.     Even if there is no contractual provision protecting the Franchisee Plaintiffs' interests here, it is manifestly unjust for THUSA to have obtained additional revenues in contravention of the Franchisee Plaintiffs' reasonable expectations.

265.     As a direct and proximate result of THUSA's machinations, the Plaintiffs have suffered severe and significant financial losses.

**WHEREFORE**, and for the reasons set forth elsewhere herein, Plaintiffs are entitled to judgment on the foregoing Counts of this Complaint in the form of:

A.      Compensatory damages;

B.      Actual damages;

C.      Statutory damages;

D.      Attorney's fees;

E.      Costs of suit; and

F.      Any and all other such relief as this Court deems just and equitable under the circumstances.

Respectfully Submitted,

**WASCH RAINES LLP**

*/s/ Adam G. Wasch*
Adam G. Wasch
2500 N. Military Trail, Suite 303
Boca Raton, Florida 33431
T: (561) 693-3221
F: (561) 404-1104
awasch@waschraines.com

**MARKS & KLEIN, LLP**

Gerald A. Marks, admitted *pro hac vice*
jerry@marksklein.com
Steven T. Keppler,
*pro hac vice application pending*
steven@marksklein.com
63 Riverside Avenue
Red Bank, New Jersey 07701
Telephone: (732) 747-7100
Facsimile:  (732) 219-0625

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that October 14, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Adam G. Wasch*_____